ROBERT LOWENSTEIN, APPELLANT AND CROSS-RE-
SPONDENT, v. NEWARK BOARD OF EDUCATION, RE-
SPONDENT AND CROSS-APPELLANT.

Argued January 9 and 10, 1961—Decided May 22, 1961.

*Mr. Morton Stavis* and *Mr. John O. Bigelow* argued the cause for appellant and cross-respondent.

*Mr. Jacob Fox* argued the cause for respondent and cross-appellant.

The opinion of the court was delivered by

HALL, J.   This case is before us for the third time.   The prior occasions are reported in *Laba v. Newark Board of Education*, 23 *N. J.* 364 (1957) and *Lowenstein v. Newark Board of Education*, 33 *N. J.* 277 (1960).   The appellant now challenges the affirmance by the State Commissioner of Education of his third dismissal as a teacher by the respondent Newark Board of Education.   This result ensued from further proceedings after our reversal of the earlier similar action in the last-cited opinion.   The Board's cross-appeal concerns only the effective date of the dismissal, fixed by it as of the inception of the controversy in 1955, but modified by the Commissioner ·to relate to the date in 1957 when the charges involved in the second case were preferred following the remand directed by the *Laba* decision.   The Commissioner consequently awarded back pay for the two year interim.   The appeals are here pursuant to our retention of jurisdiction.   33 *N. J.*, at *pp.* 291–292.

To bring into focus the precise issues now presented, some retilling of old soil becomes necessary.   The controversy stems from the refusal of appellant and two other Newark teachers to answer questions concerning past and present Communist membership and association propounded by a Congressional investigating committee in May 1955.   The declination was grounded on the Fifth Amendment privilege against self-incrimination and was made on the advice of counsel.   They were never cited by the committee for contempt of Congress.   Dr. Lowenstein at the time was a high school language teacher with about 20 years' service, of acknowledged academic and pedagogical competence and protected from dismissal by the tenure provisions of the school law, *N. J. S. A.* 18:13–17, "except for inefficiency, incapacity, conduct unbecoming a teacher or other just cause" after notice and hearing on written charges.   He had also been prominent for many years in the local and state branches of a national teachers' union.

The city superintendent of schools suspended appellant and the other two on the day of the committee session. Appellant has not taught or received any salary from the Newark school system since. Four days later each of the three was formally charged with conduct unbecoming a teacher based solely on the invocation of the constitutional privilege and consequent refusal to testify before the committee. The Board sustained the charges by a vote of 5 to 4 and ordered dismissal as of the date of suspension. The Commissioner reversed the dismissals and this court, in *Laba*, affirmed by reason of the decision of the United States Supreme Court in *Slochower v. Board of Higher Education*, 350 *U. S.* 551, 76 *S. Ct.* 637, 100 *L. Ed.* 692 (1956), rehearing denied 351 *U. S.* 944, 76 *S. Ct.* 843, 100 *L. Ed.* 1470 (1956), handed down after the Board's action. It was there held that violation of the constitutional safeguard of due process of law occurs where a discharge from public employment is based entirely upon the exercise of the privilege before a body whose inquiry is not directed at the witness' fitness or conduct in his employment and that no sinister meaning either of confession of guilt or presumption of perjury can be imputed from the exercise of this constitutional right. The privilege is designed to protect the innocent who nonetheless may have a reasonable fear of prosecution as well as to preclude a revolting inquisitorial system of justice permitting the prosecution to trust habitually to compulsory self-disclosure as a source of proof. *Slochower, supra* (350 *U. S.*, at *pp.* 557–558, 76 *S. Ct.*, at *pp.* 640–641, 100 *L. Ed.*, at *p.* 700) ; 8 *Wigmore, Evidence,* 307–309 (*3d ed.* 1940) ; *Griswold, The Fifth Amendment Today* (1955) ; *Chafee, The Blessings of Liberty, ch.* vii, The Right Not to Speak, 179–235 (1956). We therefore held in *Laba* that the invocation of the Fifth Amendment could not constitute *per se* conduct unbecoming a teacher and just cause for dismissal. The California Supreme Court, prior to *Laba,* and the Pennsylvania Supreme Court since, have held to the same effect. *Board of Education of San*

*Francisco Unified School District v. Mass, 47 Cal. 2d 494, 304 P. 2d 1015 (Sup. Ct. 1956); Board of Public Education School District of Philadelphia v. Intille, 401 Pa. 1, 163 A. 2d 420 (Sup. Ct. 1960), certiorari denied 364 U. S. 910, 81 S. Ct. 273, 5 L. Ed. 2d 225 (1960).*

*Laba* went on to say: "In the light of our controlling legislation it is clear that in this State any person who is now a member of the Communist Party or who is now subject to its ideologies and disciplines is unfit to teach in our public schools and should be dismissed under R. S. 18:13–17." (23 *N. J.*, at *p.* 388.) State policy forms the basis of this declaration, as found in the educational oath statute, *N. J. S. A.* 18:13–9.1 and 9.2, sustained and interpreted in *Thorp v. Board of Trustees of Schools for Industrial Education,* 6 *N. J.* 498 (1951), judgment vacated as moot, 342 *U. S.* 803, 72 *S. Ct.* 35, 96 *L. Ed.* 608 (1951). Consistent with this legislatively-fixed policy of conclusive emphasis on the present, the Board has quite properly agreed throughout that no right to dismiss exists merely because a teacher was a member of the Communist Party in the past when it is clear he is not presently. See *Lowenstein I, supra* (33 *N. J.*, at *pp.* 284–285). At no time has appellant been charged with either past or present party affiliation or subjection and such cannot in the present proceeding furnish a basis for dismissal, directly or indirectly.

*Laba* did not order immediate reinstatement but affirmed the action of the Commissioner in remanding the matter to the Board for appropriate inquiry by the supervisory school authorities. The theory was that, because "of the acknowledged need for keeping sensitive areas, such as the public school systems, wholly free from subversive elements which seek the overthrowal of our free society" (23 *N. J.*, at *p.* 373), the action of the teachers before the Congressional committee gave the school authorities the right of private inquiry of them to determine or assist in determining whether they were presently members or subject to the ideologies and disciplines of the Communist Party and, if so, subject to

direct charges of unfitness to teach for that reason. The inquiry approach was premised on the obligation of a teacher to respond fully, without any right to rely on the constitutional privilege, to *relevant* questions of the employer, acting through the superintendent of schools, relating to continued fitness to teach, whether the reason giving rise to the inquiry be a matter of possible Communist allegiance, moral turpitude or any other unbecoming conduct. *Laba* pointed out (23 *N. J.*, at *p.* 389) that a willful refusal to answer pertinent questions fairly submitted by administrative superiors at such an interview could also afford an ample basis for dismissal charges under *N. J. S. A.* 18:13–17. Our further comments in *Lowenstein I* are appropriate at this point:

"The right to interrogate is only for the purpose of enabling the employer to judge whether there is a reasonable ground for the bringing of dismissal charges on the basis of the employee's answers to relevant questions and of any other information at hand. It is not a broad investigation such as a legislative committee conducts, a trial or an adversary proceeding in the usual sense. Nor is it to be considered an end in itself or as a primary method of dismissal, absent clear lack of cooperation or willful refusal to answer pertinent queries." (33 *N. J.*, at *p.* 284.)

"In protecting democratic government we 'must do so without infringing the freedoms that are the ultimate values of all democratic living.' *Wieman v. Updegraff*, 344 *U. S.* 183, 188, 73 *S. Ct.* 215, 97 *L. Ed.* 216, 220 (1952). While the opprobrium of dismissal from public employment for true disloyalty is deserved if fully and fairly proved, the stain is so deep and the consequences so devastating (the same holds true where the dismissal is for refusal to answer questions relating to loyalty) that the very fibre of every constitutional right we seek to preserve, as well as every consideration of civilized human decency, dictate that this brand of infamy shall never be implanted without complete understanding on all sides of applicable principles, abundant proof and every requisite of due process. Such grievous guilt can never be found from mere association or simply on suspicion, by innuendo or through alleged inference from truly non-relevant facts. *Cf. Wieman v. Updegraff, supra; Kutcher v. Housing Authority of the City of Newark*, 20 *N. J.* 181 (1955). A back door or indirect approach cannot be approved to disguise the real basis not directly and properly proved." (*Id.*, at *pp.* 290–291.)

Another possible avenue of the inquiry and basis of disciplinary action was also outlined in *Laba* (23 *N. J.*, at *pp.* 388–389), namely, whether the refusals to answer before the committee were patently contumacious or frivolous rather than in good faith. This was quite properly not later pursued when it appeared at appellant's subsequent interview that the privilege had been exercised on advice of counsel. As we noted in *Lowenstein I* (33 *N. J.*, at *pp.* 282–283), this phase was thereby permanently removed from the case and nothing remained of the original charges preferred in 1955. They were finally dismissed by the Board at the hearing after the decision just referred to, as we had there indicated should be done.

Following the *Laba* remand, the superintendent and the Board, in May 1957, pursued the inquiry procedure which that decision had authorized. Its outcome—charges based on his refusal to respond to allegedly pertinent questions of the superintendent, dismissal based thereon by unanimous vote of the Board and affirmance by the Commissioner—brought the matter before us again in *Lowenstein I*. The issue there involved was the relevancy of those questions which appellant had declined to answer. They related primarily to *past* associations and conduct as distinct from the present. Appellant denied any Communist membership or activity at the time of the inquiry and for a period of something less than two years prior to his 1955 appearance before the Congressional committee. We were convinced that both sides had misapprehended the import of what was said in *Laba* about the scope of the inquiry with the result that neither the approach nor the course conformed to what we had intended, despite our belief that all involved undoubtedly made every effort to comply with the mandate as they conceived it. We were therefore impelled, in the cause of both the public interest and the certainty of fairness to all parties involved, to reverse the dismissal and remand the matter again to the local level, but without reinstatement in the

interim, so that a new inquiry might be pursued in the way *Laba* contemplated.

The trouble was, as we saw it and spelled it out in an opinion in which every member of the court joined (33 *N. J.*, at *pp.* 285–287), that both sides somewhat lost sight of the only proper subject of the inquiry, *i. e.*, present membership or subjection to the ideologies and disciplines of the Communist Party. On the one hand there was overlooked the essential that questioning as to past affiliations and activities is not automatically relevant and always permissible, but only so in the event of rational and reasonable doubt of the truth of denials as to the present in order to test such statements (33 *N. J.*, at *p.* 289). On the other hand, the appellant equally misconceived the concept in insisting on conclusive irrelevancy by reason of time alone and of alleged invasion of privacy (33 *N. J.*, at *pp.* 287–289).

There followed the second interview of appellant by the superintendent in September 1960 which grounds the present appeal. Again appellant, after thoroughly attesting to his present loyalty and belief in Americanism, declined to answer questions which related to views and events back of 1953. Charges were preferred on the basis that the questions were pertinent and the refusal to reply thereto impeded a fair inquiry to determine if he was presently subject to Communist ideology. He was found guilty of conduct unbecoming a teacher grounded thereon and the Board ordered dismissal —this time by a 5–4 vote. The Commissioner affirmed.

We are willing to assume that, under the circumstances of the interview, its pattern sufficiently followed that outlined in *Lowenstein I*. Questioning as to past events, which led to the refusals, for the most part followed exploration of the present and the interrogator's claim of doubt with respect to appellant's assertions of current allegiance. There was some disagreement as to whether "the present" meant 1960, 1957 or 1955. The difference is of no real significance in considering the issue before us. We think it fair, over-all, to presume that the two participants sought, in good faith,

to adhere to the principles laid down by our prior decisions as well as could realistically be expected. Since both parties were advised throughout the interview by reputable and capable counsel (the superintendent's counsel was not the attorney for the Board) whose first endeavor had to be to see that the mandate of this court was followed, the deviations on both sides that appear to exist on the face can well be attributed to the fact that the acual participants were laymen and cannot be strictly held to a standard of precise legal expression. There is apparent, however, a formalism and strictness of attitude and position throughout which we would like to have seen otherwise, but which we must recognize as probably unavoidable after over five years of litigation and local public interest in an area in which convictions are bound to be strong and feelings run high. Consequently the interview became actually an adversary proceeding, with appellant as a witness under cross-examination in a pervading atmosphere of legal rigidity. Numerous objections to questions as being outside the limitations discussed in *Lowenstein I* on the one hand, and insistence thereon on the other, fill the transcript. They were, of course, not resolved at the interview and the conflict resulted only in refusals to answer on the advice of counsel.

The precise, and concededly the only, issue before the Board, very painstakingly and correctly explained by its counsel at the hearing on the charges, was indeed a simple and a narrow one. It resolved itself into whether the superintendent was justified, as a matter of objective rationality and reasonableness, in doubting appellant's denials of present Communist affiliation and subservience and his affirmations of loyalty and allegiance to the American democratic system solely by reason of answers he gave to certain other questions concerning related aspects, and so was entitled to probe into appellant's past views and associations with respect to Communism. If the superintendent was so justified, Dr. Lowenstein was bound to answer, on penalty of dismissal,

the four refused questions forming the basis of the charges. The particular queries may be summarized as whether he was a Communist or a member of any Communist front organization or subject to or a believer in Communist ideology, discipline or principles at any time from 1950 to July 1953. If there was no such justification, the charges could not stand.

We state the issue as we have because of the nonjudicial nature of the proceedings before the superintendent. But fundamentally the matter is one of law, *i. e.,* the legal relevance of the disputed queries to the object of the superintendent's inquiry. If the proceeding had been before a judge, the matter would have been ruled upon at once as a legal question determinable by the court and not as an issue to be decided by the trier of the facts. Judges do this constantly in every trial in passing on the propriety of a particular interrogation and the admissibility of evidence. Appellant would then immediately have known where he stood. But here, because of administrative mechanics, no court could enter the picture to decide this legal question until the case reached us. So the question had to be put to the Board and the Commissioner—lay administrative agencies—in the way in which it was and appellant had to guess before the superintendent what our ruling would finally be and take his stand accordingly. See the discussion in *Chafee, The Blessings of Liberty, supra,* at *pp.* 210–212. Our subsequent discussion of relevancy in review of the action of the lower tribunals is therefore undergirded by this legal point of view as if we were sitting as a trial court having to rule on the pertinence of the questions. While a matter of relevancy must be considered in the full factual setting and a certain amount of leeway must be allowed, nonetheless it must be affirmatively clear to a court that the disputed queries have some objective "tendency in reason" relating to the object of the inquiry. See *N. J. S.* 2A:84A–3.

We should make the picture more concrete by a brief resumé of the pertinent parts of the interrogation. It commenced with appellant's responses to inquiry of his views

on Communism and "Americanism." They were clear and unequivocal. In stating that he was against Communism as he understood its philosophy and in the course of telling why, at some length, he commented:

"I don't think it is good for our people to any extent that any regime or party or organization favor and condone the violent over-throw of the Government, and I am hostile to that attitude and approach. Wherever I notice suppression of free formulation of individual unfettered opinion, restrictions of any of the institutions that people have labored over centuries to evolve or the improvement of the material or spiritual life, I am hostile to anything that threatens these hard won attainments of civilization."

His testament of allegiance to the American system may well be quoted:

"I could not imagine that any human being on this earth would rather be anything but an American citizen if he could. I certainly would not want to be anything but an American citizen. There are some institutions of ours, historically involved, that I consider so inequitable, so inadequate to the needs of our national life today in what the world looks to America for, but on the whole I think we have got a better set of institutions, a better frame-work of Government founded on our Constitution and on our bill of rights than any other people can boast of.

I think we have in our form of government the maximum opportunity granted any people so far in the history of the world to strive for individual and social betterment."

He then positively denied he was a Communist or a member of any Communist front organization and asserted that he was not subject to and did not believe in Communist ideology or discipline. He also said, in response to a specific question relating to 1955, that he had not attended any Communist organization meetings or met and engaged in discussions with known Communists. (All of these views were reiterated at the end of the interview and also when appellant testified on his own behalf at the subsequent Board hearing.) On his own motion he related the effect of all his answers back to the summer of 1953 since, as he said,

he had been willing to speak as of that date at the superintendent's 1957 inquiry.

Then came a series of questions, the answers to which evolved at the Board hearing as the basis of the superintendent's claim of doubt in the truth of the affirmations and denials just outlined. While no basis was set forth in the formal charges preferred by the superintendent, the interrogation now to be summarized was pointed out by the Board's counsel at the hearing as the source of the claim and was specified as such in the Board's written findings sustaining the charges. The first few of them sought the extent of appellant's knowledge in 1955 of the Communist party and its program in the United States and this state, to which the reply was in effect that he knew nothing. Next was a query as to whether he believed in 1955 that the Communist Party advocated the violent overthrow of the United States Government, to which he responded that he did so believe because the United States Supreme Court had said so. The subject matter was extended to the international sphere by a question inquiring as to his views whether the Communist Party was merely advocating political beliefs or was an international conspiracy one of whose objects was to overthrow this government by force. The answer was that he scrupulously tried to avoid arriving at opinions and conclusions about matters not within his special sphere of competence as a citizen, that he did not think the Supreme Court had spoken on this phase, so that he really did not know what international communism was today.

The appellant was then interrogated whether in 1955 he believed a Communist was a fit person to teach in the Newark public schools. He replied:

"The question of fitness to teach I interpret differently from many people. In my opinion, in a free society a person who meets the legal requirements in whatever capacity he chooses to engage in, the professional requirements for the position, is entitled to teach, provided of course that he is not abusive of his position and conforms to all legal and professional requirements and maintains his status of competence in those areas."

The next question was whether in 1955 he believed a person could be a Communist and also a loyal American citizen. He said he probably thought so; one could and could not; it depended on the individual. When the question was enlarged to include his belief today, he answered: "* * * I would so drastically modify what I think my view was in 1955, that I would probably say fewer and fewer people today could be loyal American citizens and Communists at the same time." He ascribed his change in view to the course of events and international relations in the past five years.

Then came a rather double-edged question: "Does the general universal knowledge that a Communist is required to deceive and cheat, and generally break the rules of a game as we know it, does this in any way enter into, in your opinion, into their inability to be loyal American citizens?" He replied he knew nothing about this and wondered what element of truth there might be in the premise.

The final queries in the series related to appellant's beliefs as to whether a teacher who was a Communist could have the required scholarship and teaching methodology requisite for his position in a public school system as well as respect for the individual. His answer was in the affirmative, prefaced by a statement that he had studied the matter in some detail, including differing views held on it by educators in other democratic countries as well as our own, and that there was no generally accepted position.

It should also be mentioned that just prior to the superintendent's claim of doubt, he asked Dr. Lowenstein whether he had attended a picnic at Midvale, New Jersey, in September 1956. The reply was that he had not and when further asked if he knew anything about a picnic at that location on that date, he explained that he had driven to the area to deliver a life insurance policy to a customer that day, had been surprised as to heavy traffic conditions in the vicinity, inquired as to the cause and was told there was a

picnic nearby. He never even saw the spot and did not know the nature of the affair.

At this point the superintendent stated his doubts. He put them this way:

"The fact is that I do have information that you were an active militant Communist; not just passive or lukewarm. And in this capacity you were a representative of the State of New Jersey; you represented the teachers' groups in the State, and particularly in Newark. You represented particularly in that capacity the Newark Teachers' Union of which you were at one time president.

This information which I have, together with further information regarding the picnic or gathering in Midvale [which the superintendent amplified to the effect that appellant and his car were seen at a point near the spot of the gathering—a labor press picnic at which several Communist members were recognized] * * *, together with the fact of your indirect answers to some of these questions * * *, together with your general attitude and demeanor in many of the answers that you have given me, that frankly I am skeptical as to some of the things you said about the present, and in view of these I do have sincere and honest doubts. Therefore it seems to me that I have no choice, no alternative, but to question you as to some of your activities and some of the persons involved in the past * * *."

The information as to prior Communist activity was stated to be from an admitted former Communist, but not further identified beyond the fact, specified at the request of appellant's counsel, that it "covered a period up to and including some time in the year 1944, 1945." (The information referred to obviously was testimony given by Dr. Bella Dodd in a hotel room in Newark to two members of the Congressional committee the night before the May 1955 committee hearing and referred to in the Board proceedings prior to *Laba*. The session was a closed one, with no outsiders present and, of course, no cross-examination. Needless to say, such testimony would never be considered by any court of law.) The terminal date had significance since it was established before the Board that Dr. Lowenstein was in military service from 1942 until November 1945, much of the time overseas, thus placing any party activity of the nature suggested prior to 1942 and at least 15 years before

"the present." Incidentally, the testimony of his commanding officer before the Board at the hearing after the *Laba* decision was highly complimentary of his services when stationed in Italy on behalf of Americanism both among our own troops and the civilian population.

Note should also be made that it was agreed that the phrase "general attitude and demeanor in many of the answers that you have given me" had reference only to the content of the answers and not to physical manifestations while testifying.

The questions which followed the expression of doubt dealt largely with appellant's acquaintance, association and activity with or with respect to certain named individuals, principally people affiliated with the New York Teachers' Union. In *Lowenstein I* (33 *N. J.*, at *p.* 289) we raised the matter of the materiality of the same line of questioning, but that matter need not further concern us here. The scope of the queries was generally without limit of time. As soon as they dealt with matters back of 1953, appellant's counsel objected on the ground that the reasons asserted by the superintendent as grounding his claim of doubt of the truth of the prior denials of present Communist affiliation or subjection and of the affirmations of current loyalty "do not come within the language of the Supreme Court authority and does not justify your inquiry into the so-called past." We believe the objection can fairly be read to mean that the reasons given by the superintendent could not validly amount to doubt as a matter of objective rationality and reasonableness and therefore inquiry as to the past was not relevant. Consequently appellant was advised not to answer most of such queries and did not. The superintendent specified in his charges only the refusal to respond to the last four questions which, as we have indicated, inquired as to Communist membership and subjection to or belief in Communist ideologies and discipline between 1950 and 1953.

Appellant's counsel did advise him to answer one question without limit of time. This inquired whether he had ever

in any fashion personally promoted the communistic point of view in the classroom or had been instrumental in soliciting other teachers to do so. He replied that he had not.

At the Board hearing on the charges, the only evidence in support was the transcript of the superintendent's inquiry. Beside Dr. Lowenstein's own testimony as to his beliefs and loyalty, several witnesses testified to his high reputation for integrity and veracity. In fact, the Board's counsel was willing to stipulate that the only evidence in the case was that of good reputation on all scores. After the argument of counsel, in which we have said the issue the Board had to decide was most clearly pointed out, the hearing adjourned for five days, on which continued date the vote to dismiss was taken after several members had made statements giving their reasons for their individual decisions, of which more will be mentioned shortly. A week after the vote the Board met again and adopted a formal resolution of dismissal as of May 20, 1955. The resolution set forth at length the answers to the questions previously detailed which it found "reasonably justified the doubts asserted by the Superintendent and the additional inquiry which he believed to be necessary by reason thereof." It further recited that it was appellant's duty to answer the four questions we have previously referred to "and that his refusal to do so and to give any information as to Communist affiliations prior to the July 1, 1953 'cut-off' date fixed by him, unduly obstructed" the effort to ascertain "all of the relevant facts which would serve to establish whether or not he is now a member of the Communist Party or subject to its ideologies and disciplines."

The Commissioner, in his decision of affirmance on the appeal, concluded that appellant was not justified in his refusal to answer the questions put. In reaching that result, the language of the opinion uses a much broader brush than was indicated by the precise issue before the Board and so before him on review. Of course, under familiar principles, if the result is right for other reasons, we need

not be overly concerned with the articulation of the process by which it was reached. However, particular reliance appears to have been placed on one aspect upon which we should comment. The Commissioner strongly took the view that appellant had, contrary to the principles laid down in *Lowenstein I,* again arbitrarily fixed a date (June 1953) beyond which he would not speak on the ground of conclusive irrelevancy. Stress was laid in the opinion on this and practically nothing was said about the primary question of whether there was a rational and reasonable basis for the superintendent's claim of doubt based on the content of the answers to certain of his questions. We believe the view taken is not warranted since we do not read the appellant's refusals to answer as arbitrary. As we have already pointed out, his counsel promptly objected to exploration of the past on the ground that the reasons advanced by the superintendent for his doubts were not legally valid as a matter of objective rationality and reasonableness and stated he would advise appellant not to answer. The latter consequently refused and said he was doing so on the advice of his counsel. Any further statements by him about not going beyond 1953 must be read in that context and in the light of our earlier observation that the lay participants should not be held to a standard of legal precision in their language. We think it fair to infer that appellant, in his declinations to answer, was in effect, though inarticulately, adopting the ground previously asserted by his counsel. Moreover, if counsel is correct in his objection, there was no sufficient basis to permit "past" inquiries at all and so it also seems to us that it really matters not what else appellant may have said when he thereafter refused to respond to particular queries.

Before returning to the reasons given by various members of the Board prior to casting their votes, perhaps we should amplify our earlier statement that the only issue before the Board was whether there was rational and reasonable basis for the superintendent's claim of doubt of the denials of

present Communist allegiance solely by reason of the answers appellant gave to the questions concerning related aspects which we have detailed. It will be recalled that when the superintendent expressed his claim of doubt during the interview, it was also grounded on information he said he had of Communist activity up to 1944 or 1945 and concerning the Midvale picnic. Neither of these bases was advanced before the Board by its counsel as justifying excursions into the past. As to the first item he specifically told the Board it was insufficient to ground a doubt and he placed no reliance on the second. In the Board's brief in this court it is expressly conceded that neither is enough, factually or legally, to generate reasonable doubt as to the present. This is eminently correct. Neither matter could have any proper place in the Board's determination of the issue before it.

█ Six of the nine Board members volunteered their reasons before they voted. Three were in favor of dismissal and three against. Understanding of the issue to be decided and expressions of a proper basis for the individual's decision are sufficiently evident in the case of four, considering each statement as a whole as we must since made by laymen. But we are greatly concerned about the comments of the other two, who were, respectively, the maker and seconder of the motion to dismiss and the subsequent motion to relate the dismissal back to May 1955. Their votes were numerically decisive in the 5-4 results. Appellant urges the reasons they gave resulted in a failure by the Board to abide by our decision in *Lowenstein I.* The Commissioner did not pass on the point. Our study convinces us, upon fair consideration of the total remarks of these two, that, though persons of undoubted sincerity, honesty of purpose and understandably strong convictions in the whole matter, they did not decide the issue so plainly presented, but instead voted for dismissal on grounds with which appellant had not been charged and for reasons which had no valid place in the matter. We must therefore conclude, apart from anything else, that the dismissal cannot stand.

The first of these two prefaced his remarks by saying that "I am looking at this from a viewpoint more or less as a father and perhaps even more as a spectator" and concluded:

"* * * I am not making any decision so far as to what the Supreme Court has said or hasn't said. I am making my decision on the fact that I am a father with children who go to school and the type of person that I would like to have teach my children."

Leading up to the latter statement he spoke strongly that he was "awfully sure" appellant had lost "his respect," had grave doubts that "he was a normal American teacher" and as a father could not see "where he has any effectiveness in our school system." He appeared to have based his views only on the substantive matter of appellant's refusal to answer whether he had been a Communist before a certain time. Accepting at face value his statement that he could not absorb the "legal implications * * * in the time allotted" (he was one of three new appointees to the Board since the 1957 case), it is nonetheless perfectly clear that he did not consider at all the plain and simple problem whether the superintendent, by reason of appellant's answers to other questions, was reasonably justified in his doubt of present allegiance. Rather he found appellant guilty of the uncharged substantive offense of present unfitness to teach by reason of refusal to reveal past Communist affiliation. This is analogous to a jury convicting a defendant of murder when he had been indicted and defended himself on a charge of larceny.

The second member whose remarks especially concern us also did not attempt to pass judgment on the basis of the issue before the Board. His decision, he said, "is based on the moral issue that is involved." It is, of course, elementary that vague and personal ideas of moral right and wrong cannot be a determinant of a specific issue of the kind the Board had to decide. Apart from that, the moral issue

he apparently had in mind he defined as the unwillingness of appellant "to bend backwards to give us some information to help us to decide some of the issues for the years preceding 1953." We can only interpret that to mean, not so much skepticism as to present loyalty, but a view in this member of a right to dismiss if appellant had been a Communist prior to the year mentioned. Not only was there no such charge involved but it had been made as clear as anything could be by the Board's own concession that such was no valid ground for dismissal even if true.

It further seems reasonably inferable that these two members at least, if not the entire majority, also had in their minds a vestige of guilt because of appellant's exercise of the Fifth Amendment privilege before the Congressional committee in 1955. It is difficult to find any other reason for their motion to relate the dismissal back to that date, especially after we had spoken so directly in *Lowenstein I* that nothing whatever remained of the original invalid charges preferred on that basis.

It may be noted in passing that the state of mind of these two members is sharply pointed up by contrast to the comments of two other members on the same subject matter. In articulating the distinction between broad questions not before them and the precise issue they had to decide, these two both indicated that, while they thoroughly understood appellant had the right to stand on a legal position as this court had defined it in the prior decisions and they had to decide the matter accordingly, they were nonetheless unhappy that he had chosen to so limit his responses. They expressed their thought that he had thereby impaired his value and usefulness to the school system and that it would have been better for the community and the profession had he not been so adamant. This was a natural viewpoint and at the same time a very proper recognition that an issue arising out of valid insistence on legal right cannot be judged—by the Board, the Commissioner or this court—on

whether it was the wise course for the individual to pursue under the circumstances.[1]

Our conclusion that the dismissal must fall for the reason given rests upon most fundamental principles. "Administrative action is of necessity judged by the grounds from which it proceeded according to the record." *In re Plainfield-Union Water Co.*, 11 *N. J.* 382, 395–396 (1953). A court should readily interfere where the action is illegally grounded, as distinct from a situation where there is involved only the reasonableness of the administrative result reached on a proper basis. *Cf. Borough of Fanwood v. Rocco*, 33 *N. J.* 404, 414–415 (1960); *Bivona v. Hock*, 5 *N. J. Super.* 118 (*App. Div.* 1949); *South Jersey Retail Liquor Dealers Ass'n v. Burnett*, 125 *N. J. L.* 105 (*Sup. Ct.* 1940). And where, as here, the power of the agency (the Board) to act and the extent of that power are prescribed and delineated by a prior judicial opinion in the matter and the court's mandate on remand, the appellate judgment becomes the

---

[1] In this connection there comes to mind the observation of the late Professor Zechariah Chafee, Jr., one of the nation's greatest defenders of civil rights, in his last work (*The Blessings of Liberty, supra*) where he said, with reference to invocation of the self-incrimination privilege, but which seems equally applicable to insistence on strict legal limitation of questioning by an employer:

"If I were consulted by a prospective witness who contemplated the possibility of claiming the privilege or wanted to keep silent for any other reason, I should give him two pieces of advice:

*First*. 'It is not only a legal requirement, but also by and large a principle of wisdom and good citizenship for an individual called before a court, a grand jury, an administrative commission, or a legislative investigating committee, to answer questions frankly and honestly. The constitutional privilege to keep silent is an exception to your legal obligation to testify; but even when the legal privilege is available, there are times when it is best not to exercise it. For one thing, although the law is plain that you do not admit guilt by claiming this right to silence, the law cannot control the effect on public opinion. The fact that you feel it necessary to refuse information to a government agency on the ground that it will incriminate you, inevitably casts a shadow on your reputation, whether fairly or not. Also you hurt the enterprise where you work, and you will perhaps imperil your job there' * * *." (at *p.* 217)

law of the case and the agency is under a peremptory duty not to depart from it. *In re Plainfield-Union Water Co.*, 14 *N. J.* 296, 302–303 (1954) ; *cf. Flanigan v. McFeely,* 20 *N. J.* 414, 420–421 (1956) ; *Reinauer Realty Corp. v. Borough of Paramus,* 34 *N. J.* 406 (1961). When it affirmatively appears on the face of the record below as clearly as it does here that the two decisive votes were based on extraneous issues not before the body for decision, fundamental unfairness results. *Reinauer Realty Corp. v. Borough of Paramus, supra.* In the face of the record it would be a travesty to suggest that the defect was somehow cured by the letter-perfect formal resolution of dismissal and findings prepared by the Board's counsel and adopted some days later. In this kind of situation the standard of judicial review must be the fundamental premise of substantial justice. *Russo v. The Governor of the State of New Jersey,* 22 *N. J.* 156, 168 (1956).

The question that now presents itself is what disposition we should make of the case. Ordinarily where an administrative agency decides a matter improperly, a reviewing court will remand the proceeding to the erring tribunal for redetermination on a proper basis. But here, as we have said, a question of law is what is fundamentally involved. Moreover, even if we look at the matter as if we were standing strictly in the shoes of the Board and the Commissioner, this court does have undoubted power to make independent findings of its own and will exercise that right where the interests of justice require. *R. R.* 4:88–13; 1:5–4(b). *Borough of Park Ridge v. Salimone,* 21 *N. J.* 28, 39 (1956) ; *Greco v. Smith,* 40 *N. J. Super.* 182 (*App. Div.* 1956) ; *cf. Rushin v. Board of Child Welfare,* 64 *N. J. Super.* 504 (*App. Div.* 1961). The considerations that usually dictate the opposite course are not present here. Again we repeat that the only issue is whether objective, rational and reasonable doubt of appellant's denials of current Communist affiliation and subjection can be grounded on his answers to the questions earlier detailed so as to make

inquiry into the past legally relevant and permissible, as we spelled it out in *Lowenstein I*. An essential of the factual setting is the matter of appellant's veracity. And by concession, there is not involved the matter of demeanor or other physical manifestation during the questioning, so the element of due regard for the personal opportunity of the interrogator to judge credibility is absent. See *R. R.* 1:5–4(b). Also it is not a question of any particular expertise in the field by either the Board or the Commissioner. *Russo v. The Governor of the State of New Jersey, supra* (22 *N. J.*, at *p.* 169); *Connelly v. Jersey City Housing Authority,* 63 *N. J. Super.* 424, 428 (*App. Div.* 1960). All in all, the question is peculiarly one for court determination, which can fairly be done on the printed record.

Moreover, and of greater significance, this controversy has already lasted six years and it is in the interest of essential justice that it be finally concluded. A remand by reason of the fundamental error mentioned would have to be to the Board. (It may be observed that very recently the Legislature has changed the procedure for the hearing of charges against tenure teachers. Such matters are hereafter to be determined in the first instance by the Commissioner and no longer by the local board. *L.* 1960, *c.* 136; *N. J. S. A.* 18:3–23 *et seq.* The statement annexed to the bill gave as one reason for the change that "publicity attendant on the local hearing often 'tears the community apart' and disrupts the orderly conduct of local school affairs.") If dismissal were again the result, another appeal to the Commissioner would undoubtedly follow. In light of the latter's view expressed in his present decision, a further review would ensue. And the meritorious question on which the case finally must turn then at last before us would be no different than it is today. All considerations clearly indicate that we should now determine it once and for all and we shall do so.

In *Lowenstein I* we pointed out that while an employee may not rely on the fundamental privilege against

self-incrimination in refusing to answer questions in an interview by his employer with respect to fitness, "[p]rior event queries may not be posed just for their own sake and one cannot be compelled involuntarily to bare one's soul as to the past for that reason alone. Relationship to the object of the inquiry must appear." (33 *N. J.*, at *p.* 285.) In other words, there is a qualified right not to speak which may be insisted upon even in such a setting, worthy of protection in the interests of the primary objects and benefits of a free society and not to be lost sight of. So the requirement, where as here the purpose of the inquiry is to shed light upon and ascertain an employee's present beliefs and motivations, that rational and reasonable doubt as to the truth of current professions must objectively exist before more than the immediate past can be explored, and then only to aid the interrogator in coming to a conclusion as to the truth of a response concerning the present. Although we must deal with the somewhat theoretical concept of rational and reasonable doubt, it is nonetheless a standard well known and constantly applied by courts in many areas of the law. If, then, we are thoroughly convinced there is no sound basis in reason or logic for such a doubt on the basis assigned for it, we must conclude the questions which appellant refused to answer were not legally relevant and the Board could not properly find that they were. We are so convinced.

The Board concedes that there is not a shred of fact in this record tending to indicate in any way that Dr. Lowenstein was a Communist or subject to the ideology and discipline of that party, from at least 1953 on. And, even if the question were before us, we cannot reasonably infer from the record any prior membership unless the Dodd information is considered and that admittedly did not extend beyond 1944 or 1945. Moreover, those accusations are conceded to be too remote in themselves and there seems to us to be no sufficient supporting bridge between then and the present. It is also agreed, as we have said, that the only conceivable

basis for any doubt of the truth of his assertions as to the present is the content of the answers given to certain other questions. These answers can fairly be characterized as "unorthodox" in the sense that they differed in many respects from those that would probably be given to the same questions by most citizens in this country today, *i. e.*, that they were not the popular or expected responses. It is not suggested that they were not true and sincere answers, but rather that they were "queer." In fact, at oral argument, counsel for the Board expressly stated that if the replies had been "orthodox," the superintendent would not and could not have had any doubts as to the professions of present loyalty and non-Communist adherence.

The particular queries and responses relied upon by the Board and earlier set forth in detail herein fall into two general categories. The first dealt essentially with appellant's belief and understanding in 1955 and since about objectives and methods of the Communist Party here and internationally. The replies were to the effect of lack of precise, personal knowledge sufficient to form and express an opinion except where, to his understanding, the United States Supreme Court had spoken on the subject in which instance he adopted its conclusion. Appellant is obviously a person of independent mind, not given to forming or expressing opinions without being conscientiously convinced of the soundness and accuracy of the underlying facts. His mental processes appear to be those of the scholar who does not jump to conclusions or accept a popularly held viewpoint without question and study. These answers clearly seem to be intellectually honest ones from a man who is reluctant to talk of matters about which he does not feel thoroughly qualified. We fail to see where they could possibly indicate any preference for Communism or induce a rational skepticism of his professions of loyalty.

The second category of questions related to appellant's views as to the fitness of a Communist to be a teacher and ability to be a loyal American citizen. With respect to his

expressed belief of teaching fitness, he frankly stated that he held different views from many people. As much as most persons would not agree, Communists are permitted to teach in other democratic nations and appellant's view is held by many eminent members of the teaching profession in this country whose loyalty cannot be suspected in the slightest. See *Academic Freedom and Tenure in the Quest for National Security,* Report of a Special Committee of the American Association of University Professors, 42 *Bulletin* (of the Association) 49 (1956). The many varied writings on the subject are listed in 2 *Emerson and Haber, Political and Civil Rights in the United States* 1084–1085 (2*d ed.* 1958). Again we say, as much as this group of answers may well be dissented from by the vast majority of our people, they appear to represent honest views which appellant has every right to hold and express and which cannot in any way cast doubt on his allegiance or the truth of his assertions thereof.

Moreover, further reflection makes it crystal clear to us that these "unorthodox" answers buttress the truth of his professions of American belief and denials of Communist affiliation and subjection rather than detract therefrom. It must not be forgotten that he was not just a participant in a discussion between two people but a sworn witness under cross-examination in what amounted to a rigid and tense adversary proceeding with a long history of hard fought litigation behind it. No one in his position could help but know the kind of answers which would satisfy and end the whole matter favorably. If he had lied about his present beliefs and affiliations, it is safe to say he would have followed by giving popular and, as to him, dishonest answers to the subsequent questions under discussion. So the very fact that he responded to them the way he did is the strongest kind of proof of the veracity of expressions of his basic tenets and of the unreasonableness of any doubt thereof.

From a deeper aspect we, as a free people, can never reach the point where the loyalty of a man can only be

established by his giving one set of "stock" answers to such questions or where he can be deprived of his position as a teacher because he dares express an unpopular view, no matter how wrong many may think that view to be. Although the immediate battle might be won, surely the war would ultimately be lost if the contrary were to prevail. There is just not enough in this case to warrant a dismissal for refusal to answer the four questions. It is therefore set aside and reinstatement directed. If the school authorities had any sound basis to believe that appellant is a Communist member or subject to party ideologies and disciplines, we assume there would have been a specific charge to that effect by which that question would be directly, fully and fairly tried out and determined.

There remain the interrelated questions of back pay and the Board's cross-appeal from the Commissioner's modification of its action whereby he set aside that portion which had made the dismissal effective as of 1955 instead of as of the date of the 1957 charges. By reason of this reversal he awarded back pay for the two year period between 1955 and 1957, at the same time sustaining the dismissal as of the latter date.

We see no merit in the Board's position in this respect. As was indicated by *Laba* and clearly said in *Lowenstein I,* there being no legal warrant for the 1955 charges, they completely fell. By the same token, suspension accompanying them also lost all legal efficacy. The mere fact that we directed in *Laba* and *Lowenstein I* that appellant not be reinstated pending pertinent inquiry and final outcome under the procedure we outlined as appropriate did not revive that suspension. The case had to rest after *Laba* only on the charges preferred in 1957 and since. The Commissioner was correct in finding that it was error to relate the dismissal back to 1955, although the matter is somewhat academic in the light of our decision that the dismissal cannot stand at all.

While the Commissioner gave practical effect to his change of the dismissal date by awarding back pay for the two year interim period, our holding that he was correct is not intended to settle the right to salary for that time or, for that matter, for any subsequent period. Appellant appears to claim his full salary since 1955 although only the last sentence of his brief mentions it: "Back pay will follow pursuant to *R. S.* 18:5–49.1 (*Laws of* 1948, *c.* 241)." The Board has not argued the question beyond the point in its brief contesting the Commissioner's determination as to the effective date of dismissal in which it did not refer to the back pay aspect at all. So we do not know whether it thereby intended to concede it was liable for full salary between 1955 and 1957 if this court sustained the dismissal but agreed with the Commissioner as to the effective date or for full salary from 1955 to date if, as is the result here, we set aside the dismissal and ordered reinstatement.

Under the circumstances we feel we should not attempt to make any disposition of the question now. The statute referred to (*N. J. S. A.* 18:5–49.1) provides that if a dismissal or suspension by a local board of education "shall upon appeal be decided to have been without good cause," the person involved "shall be entitled to *compensation*" for the period covered, provided written application therefor be filed with the local board "within thirty days after such judicial determination." (Emphasis added) (Note also *L.* 1960, *c.* 136, *sec.* 6 (*N. J. S. A.* 18:3–28), effective October 5, 1960, the statute directing charges against tenure teachers to be heard and determined by the Commissioner rather than the local board, which provides that a board may suspend the person against whom a charge is made upon certification thereof to the Commissioner, but that if the charge is ultimately dismissed, immediate reinstatement shall follow with *"full pay"* as of the time of the suspension.) *N. J. S. A.* 18:5–49.1 seems to contemplate that the matter of back pay should be disposed of separately and subsequent to the determination of the substantive charges. It there-

fore appears to us that appellant should follow the course laid down in the statute and make application to the Board within 30 days of the coming down of our mandate for such sum as he deems he is legally entitled to. If the amount cannot be then settled and agreed upon, the Board should certify the question to the Commissioner for determination pursuant to the procedure prescribed by the 1960 act (*N. J. S. A.* 18 :3–23 *et seq.*) after full hearing including the presentation of such evidence as may be material. In the interest of expeditious disposition of this final phase of the controversy, we will retain jurisdiction to the extent that either party may appeal directly to this court from the Commissioner's determination by filing a notice of appeal within ten days thereafter. Without intending either to indicate issues which should be raised or to circumscribe counsel in their contentions, we might call attention to the discussion of the various aspects of the problem of back pay in our recent opinion in *Miele v. McGuire,* 31 *N. J.* 339, 347–352 (1960), particularly with reference to the question of reduction of the amount thereof by sums which were actually earned or could have been earned during the period (possibly less appellant's costs and attorney's fees of the litigation) in the light of the actual language of and legislative intent evidenced by *N. J. S. A.* 18 :5–49.1 and 18 :3–28 (if substantively applicable since enacted after this controversy arose). Compare *R. S.* 40 :46–34, as amended.

The determination of the Commissioner of Education affirming, as modified, the action of respondent Newark Board of Education in dismissing appellant is reversed and respondent is ordered to reinstate appellant to his position as a teacher.

FRANCIS, J. (dissenting). In *Laba v. Newark Board of Education,* 23 *N. J.* 364 (1957), Justice Jacobs, speaking for this court, noted that Dr. Lowenstein had pleaded the Fifth Amendment on being interrogated by a Congressional committee with respect to present or past membership in

or association with the Communist Party, and that his reliance thereon had resulted in dismissal by the Newark Board of Education from his teaching position in the public school system. The opinion, representing the unanimous view of the court (on this phase of the problem) agreed with the State Commissioner of Education that a plea of that nature could not of itself provide a basis for the action taken by the local board. In approving the Commissioner's remand for a further hearing, certain observations were made with respect to the course and scope that the inquiry might properly take.

The court said that assertion of the constitutional privilege against self-incrimination does not justify automatic dismissal, but it "does call for a full and conscientious inquiry as to whether [such a person] is qualified to continue in the discharge of his teaching responsibilities at a place dedicated to the advancement of democratic ideals." 23 *N. J.*, at *pp.* 393, 394. In an inquiry of that character Lowenstein had a "duty of cooperation and an affirmative burden in the establishment of [his] fitness." *Id.*, at *p.* 392; and in examining him the school authorities could with propriety interrogate "with respect to [his] present and past association with the Communist Party and affiliated organizations" and they were "entitled to frank and full disclosures." *Id.*, at *p.* 388.

At the rehearing on May 16, 1957, before Dr. Edward F. Kennelly, Superintendent of Schools, the information justifying the inquiry was not limited to the assertion of the Fifth Amendment privilege before the Congressional committee. The record shows additional material of varying degrees of probative force (for purposes of this type of interview) concerning Lowenstein's alleged Communist connections and activities. The information came largely from statements of one Dr. Bella Dodd, a former Communist, apparently given in her testimony before the Congressional committee. For example, at the interview of June 21, 1955,

counsel for Lowenstein placed in the record the following excerpt from her testimony:

"Q. The Committee's purpose in calling you at this time is to ask you whether or not you knew, as a member of the Communist Party, an individual by the name of Dr. Lowenstein?
A. Yes, I did."

Moreover, in the appendix of Lowenstein's brief on the second appeal in this court further questions and answers of Dr. Dodd were included:

"Q. Will you tell the committee whether or not Mr. Robert Lowenstein was in frequent attendance at the fraction meetings of the Communist Party in New York, which you have just described?
Dr. Dodd: Mr. Lowenstein was the individual who came to any meeting held by the top committee of the Communists in the American Federation of Teachers, when held in New York.
*        *        *        *        *        *        *
Q. Will you tell the committee whether or not Mr. Robert Lowenstein played any part in the accomplishment of that objective?
Dr. Dodd: Mr. Lowenstein was regarded as the most important member of the Communist group in this activity, although the technical leadership was given to the Communist Party member who became the State Chairman of the American Federation of Teachers. *   *   *   She was the official person, although Mr. Robert Lowenstein was the effective instrument, the person who did the organizing."

At the outset of the rehearing Kennelly informed Lowenstein that he was interested in "only one thing, and that is getting at the truth of this situation"; since the testimony was to be given under oath by consent he anticipated that "we will get at that truthfully and fully."

The interrogation which began on a friendly, informal basis soon reached an impasse. Lowenstein denied present membership in the Communist Party and denied that he subscribed to the aims or disciplines of the Party, but he refused to say (1) whether he had been a member within the past ten years or five years, (2) whether during the same period he had been a member of the "Ralph Fox Branch of the Communist Party either in Newark or in Essex

County," or (3) whether during the same period he was active in "recruiting teachers in the American Federation of Teachers for communist membership." His reason for the refusal was that the questions were too remote and were not relevant to the issue of present fitness to teach in the school system. In this connection he selected and sought to impose upon the Superintendent a time boundary, July 1, 1953, back of which he announced he would not answer questions as to Communist membership or activities. That date, it may be noted, is less than two years prior to the Congressional committee proceeding, three weeks more than two years prior to the first Board of Education hearing and slightly less than four years before the 1957 rehearing. His position was put in this fashion:

"Dr. Kennelly, I am prepared to tell you that from the summer of 1953 on I have not been and I am not a member of the Communist Party;"

"I will say, Dr. Kennelly, that at no time since the summer of 1953 have I been a member of the Communist Party."

Other illustrations of the nature of his stand are:

"Q. Were you ever a member of the Ralph Fox Branch of the Communist Party either in Newark or in Essex County? A. That is too broad a question for me to answer."

"Q. That 'at any time' would include the period after the summer of 1954, wouldn't it? A. Well, sir, after the summer of 1954 on I have not been a member of nor affiliated with, nor whatever phraseology—

Q. Let me repeat it. The Ralph Fox Branch of the Communist Party. A. The answer would be no, sir, as far as anything subsequent to the summer of 1954 is concerned.

Q. Subsequent to the summer of 1954 you had been aware of the existence of it?

A. No, sir.

Q. I will ask you the same question with respect to 1954.

(Dr. Lowenstein consults with counsel.)

A. I will answer that question, sir, and in the negative.

Q. That is with respect to 1953?

A. Yes, sir. And in the negative. But I will not be pushed back year by year."

Although Dr. Lowenstein submitted to some interrogation relating to matters more remote than 1953, he remained adamant in his refusal to answer as to the subjects and times referred to above.

The court's opinion on appeal from the subsequent dismissal recognized that the questions covering the ten-year and the five-year periods would have been proper if the Superintendent in good faith felt that they were necessary in order to satisfy or to remove doubts in his mind as to the truthfulness of the witness' disavowal of present membership in or adherence to the ideology of the Communist Party, and so advised the witness. My impression at that time from the record was that a person of Dr. Lowenstein's education and seeming intelligence would have gathered that such was Dr. Kennelly's motive.

Some of the factors which gave rise to that view should be mentioned. I have already referred to Dr. Kennelly's statement at the inception of the hearing that his purpose was to get at the truth of the situation. In the course of the questioning, when the witness was asked about membership in the Communist Party in the previous ten years and declined to answer, he was then asked:

"Q. Do you mean that a question, the purpose of which is to determine membership or non-membership in the Communist Party, is not relevant to the purpose of this conference?

(Dr. Lowenstein consults with counsel.)

A. I have already answered for the present time, sir, and I think membership or non-membership ten years ago is irrelevant.

Q. All right, then I ask you this: Have you been a member of the Communist Party within the past five years?

A. I give the same answer to that, sir."

And at another point he said:

"* * * I think anything beyond that [summer of 1954] is rather remote, and in any case I have never felt that anything beyond or this side of that really is relevant to my fitness to teach. But I would be willing to talk about anything from the summer of 1954 on."

At the conclusion of the questioning but before closing the hearing, Dr. Kennelly made this observation to the witness:

"Q. Bob, I would like to advise you, and also for the record, that none of these questions that I have asked you are meant to relate to any particular portion of the period of your career prior to the summer of 1953. As I have already said, there is nothing magic to me about the summer of 1953, nor would there be anything particularly magic to me about the fall of 1949 itself. The whole purpose of the questions so framed with respect to the time element was my attempt to get information that would be helpful to me in terms of the progressive steps and an attempt on my part to judge, therefore, your fitness as of May 1955 and as of now, to continue to be a teacher in the Newark Public Schools. So with that thought in mind I have not been able to share with you the distinctions and the reasons you have used as to any particular magic date determining remoteness on one hand or lack of remoteness on the other hand, and I wish to point out to you that your reluctance to answer all questions prior to the date which you selected, the summer of 1953, does not give me information that I hoped would be helpful in determining what I have the responsibility to determine.

I am saying that to you so that you will understand from my point of view that I was placing no special emphasis on any particular date or season of the year, and it was within that framework that I was exploring those questions. Therefore, I will ask you once more if, in the light of this statement or explanation of mine, you wish to change any of your responses to those of my questions that had to do with that broad period prior to the summer of 1953.

(Dr. Lowenstein consults with counsel.)

A. I thank you for the opportunity you have given me, but I will not change my answers."

Thereafter, following the filing by the Superintendent of the transcript of testimony and his charges against Dr. Lowenstein based upon the refusal to answer the questions, a hearing was had before the Board of Education. In my judgment, this proceeding was marred by an unprecedented action, that is, the calling of Dr. Kennelly to the witness stand for the purpose of permitting Dr. Lowenstein's counsel to cross-examine him as to the support he found in the testimony taken before him for the charges filed with the Board which were then being heard. The record showed

that as an accommodation counsel for the Board consented to this step. All that can be said for such unique procedure is that it was not unfair to Dr. Lowenstein.

From the discussions of counsel and the additional questioning which took place at that hearing in Dr. Lowenstein's presence, it seemed to have become plain (assuming there was doubt prior thereto) that at least one basis on which the questions were put to Lowenstein by the Superintendent was that of credibility. For example, during an argument as to the propriety of a question asked Dr. Kennelly, counsel for the Board said:

"* * * I say when you are trying to find out whether a man today is a Communist * * *, when you are conducting an inquiry to determine whether there was a basis for believing whether a man to-day is a Communist, and you are asking him about his past association to weigh his present protestations that he is not to-day, a legitimate question is any question that could throw some light on the veracity of his present bald denial, 'I am not now a Communist; I have not been since 1954.' * * *"

Later, Lowenstein resumed his capacity as a witness and made a long statement as to his present loyalty to the United States. At that time he was specifically given the opportunity to add anything he wished to the record. The particular questions which he refused to answer before Dr. Kennelly were again called to his attention and he remained steadfast in his position that anything prior to July 1, 1953 was too remote and not relevant as to his capacity to teach. In fact, he said he was "ashamed" of having answered any questions as to pre-1953 subjects, and that he was "sorry" he had not refused to answer them; that the answers constituted "a permanent blight" against him, and because he had answered he described the record as an "ignominious" one. And when he was asked if he conceived that "it is impossible that any inquiry into affiliations prior to that date, July 1, 1953, could under any circumstances cast light on [his] present employment, as far as communist affiliation is concerned," he replied that under the Constitution "no inquiry to give that kind of light is authorized."

The state of the record at that time gave me the impression that it would have made no difference in Lowenstein's attitude if the Superintendent had specifically proffered the information that the questions as to the past were being put on the issue of veracity. But, thinking that I might be mistaken in view of the majority opinion and because we were acting in such a sensitive area, I joined in the remand in order to remove any doubts. My colleagues felt that Dr. Kennelly might have misinterpreted the sense of the *Laba* opinion and concluded that the reference to present and past affiliation provided a sanction for interrogation without limit into the past. Such misinterpretation, they reasoned, might have been responsible for his failure to advise the witness as to the nature of the light he was seeking. My feeling was that the language of this court in context was perhaps construed too broadly by Dr. Kennelly; that it was properly construed by Dr. Lowenstein, but was misapplied by him in refusing to furnish answers to some of the questions.

As I read *Laba* it authorized an inquiry into present affiliation (as well as affiliation as of the date of the Congressional Committee hearing) with or adherence to the principles and purposes of the Communist Party. It also approved an excursion into such past connection to the point of remoteness. Examination into the past to the point of remoteness would serve two ends: (1) assist in forming a judgment as to the truthfulness of a denial of such existing affiliation or beliefs; and, (2) if membership and disassociation in the reasonably recent past did appear, provide information as to the nature and extent of Lowenstein's activities while a member, *e. g.,* whether he taught *Party* Communism in his classes, or enlisted others to join the Party and teach Communism (in the Party sense) to their students. It must be kept in mind that disposition of the charges, if any were made after such an interview, might not result in dismissal in all cases. The Board might not dismiss on a finding involving only past membership in the

Communist Party. Mrs. Laba was not dismissed after she admitted membership. Dismissal would rest in the discretion of the Board. It might depend upon the nature and extent of the party discipline the teacher had subjected himself to, whether he had taught the party line in his classrooms or whether he had solicited other teachers to join the Communist Party.

In the first interview by the Superintendent the refusal to answer was based on the ground that the questions were too remote. "Remoteness" in a case of this kind is not susceptible of fixed definition. As my colleagues said, a question whether a teacher was *ever* a Communist is improper. Manifestly, as some case histories reveal, there is a substantial difference between persons who listened to the siren song of Communism in the depression days of the early 1930's and who withdrew on learning of its treasonous motives, and others who joined the Party and subscribed to its disciplines after the Korean conflict. Accordingly, it seemed to me that the Superintendent in that interview incorrectly assumed that unlimited interrogation into the past was approved. On the other hand, Dr. Lowenstein, who said he had made a deep study of the *Laba* opinion, correctly concluded that he was obliged to answer questions as to present connection with the Communist Party and past connection to the point of remoteness. The impropriety of the position he took at the interview and in the testimony before the Board arose from his decision to set July 1, 1953 as the terminal point of relevancy, and the beginning point of remoteness. On the record then before us that arbitrary limitation could not be justified. On the other hand, the paucity of information which resulted from the abortive questioning made it impossible for us to establish a fixed point at which remoteness began.

In part explanation of his refusal to answer, Dr. Lowenstein had stated that he had studied the *Laba* decision under the guidance of counsel and felt that in selecting July 1, 1953 as the date back of which he would not permit ques-

tioning, he was making a consistent, sensible explanation of what the court indicated was his legal obligation. He said also that when the Supreme Court says "This is the law," he abides by the law. For that reason he answered questions which he felt obliged to answer as a law-abiding citizen. Accepting these statements as sincere, I assumed that he would make fair and responsive answers at the reinterview to all questions put by the Superintendent which would be proper and relevant.

For the reasons stated and with some misgivings, I concurred in the remand of the matter for the third interview.

The second opinion of this court did not depart from the principles enunciated in *Laba*. Lowenstein's reliance upon the Fifth Amendment before the Congressional Committee, of itself, would not justify his dismissal. But it imposed upon Dr. Kennelly the duty of conducting a full inquiry to determine if Lowenstein is qualified to remain as a teacher at a place dedicated to the furtherance of democratic ideals. Questioning as to his present and past association with the Communist Party and affiliated organizations was approved and the basis for it made more explicit. The opinion said:

"If he answers all questions relating to current status (*i. e.*, association with the Communist Party or subjection to its disciplines) in the negative and the employer has no reason *whatever*, either because of other information in his possession or of skepticism as to whether the answer should be believed from the general standpoint of credibility, to doubt the full truth and sincerity of the denials and *does not feel the need to test them*, the inquiry must * * * end. But if the inquirer has *honest doubts*, or other information at hand seems inconsistent with the present disavowal so as to indicate the need for test and further query, he is privileged to probe backward from the date of the interview, for past conduct then becomes relevant to the present." *Lowenstein I*, 33 *N. J.*, at *p.* 286. (Emphasis and insertion added)

Lowenstein's role in the inquiry continued to be as suggested by *Laba*. He had a "duty of cooperation and an affirmative burden in the establishment of [his] fitness";

and the Superintendent was "entitled to frank and full disclosures." In *Lowenstein I,* however, a ruling was made with respect to a basic controversial position which he had assumed at the previous interview and in his argument in this court. He was told that there is no

"* * * legal justification for a teacher under inquiry to set an arbitrary date beyond which he will not speak on the ground of conclusive irrelevancy." At *p.* 288.

At this point I must digress momentarily to express sympathy with the difficulty apparently experienced by the parties, the Superintendent and the Board of Education, in understanding and reaching common ground as to the significance of the words "now" and "present" as used by this court. The opinion said that "present" membership in or affiliation with the Communist Party or "present" subjection to its ideology was the test of fitness to teach in the public school system. But it did not elaborate as to just what was meant by "present" membership, affiliation or subjection. Obviously, it did not signify such association by Lowenstein on the date of the interview alone. Naturally that day was to be included but it could not be said to be exclusive. Strictly speaking, today is the present and yesterday is the past, but in a context such as this the period constituting the present must be of broader coverage. Would anyone say that if a teacher withdrew from the Communist Party today he could not be dismissed as unfit or otherwise disciplined by the Board of Education, even though for years up to yesterday he had been teaching his students the party principles and inciting them to overthrow the government by force? So, under ordinary circumstances, "present" must denote at or about the time of the teacher's suspension from active duty in the school system.

Thus, for purposes of this case (except for a circumstance to be mentioned), membership in the Party or adherence to its program at or about the date of Lowenstein's suspension should be the test applied, *i. e.,* May 19, 1955. That date

must be the beginning of the "present" and therefore the focal point of the inquiry. The period covered by the "present" would be from May 19, 1955 to the date of any reinterview. Otherwise, if such a controversy went through the courts for ten years and then was sent back to the Superintendent because of some error in the proceeding, the date of the reinterview would be the test date. The strongest partisan of a teacher's cause could not reasonably adopt such a rule.

In the last appearance of the case in this court, the matter in contention centered about the right of the Superintendent to inquire into past connections with Communism, particularly with respect to a time prior to July 1953. It did not seem necessary then to elaborate about the precise connotation of "present" or the date or period which was within its limits. But actually in the factual framework the question of what was meant by "present" association, *i. e.*, whether it meant the date of the reinterview or some earlier date or period, played an unnecessary part and exerted a diversionary influence in the treatment of the case. Lowenstein had testified previously that "from the summer of 1953 on" he had not been a member of the Communist Party "and that after the summer of 1953 on" he had not been a member of the Ralph Fox Branch of the Communist Party. As a consequence Lowenstein himself made the primary issue clear: Was he a member of the Communist Party or subject to its ideology in the summer (or in July, as he also put it) of 1953 or thereafter? If at the forthcoming interview Dr. Kennelly believed the statement of nonassociation or connection on that day or back to July 1953, it was incumbent on him to end the inquiry. But if with the entire record of the case to date in mind he had an honest and reasonable doubt as to the veracity of Lowenstein's denial, he was justified, in his quest for the truth in pursuing his interrogation backward from July 1953 to the point where reasonable persons would not disagree that remoteness had been reached.

Returning now to the main stream of the case, it seems necessary to refer to some deep-rooted principles by which the mental attitude and conduct of all the actors involved in the reinterview should have been guided. The public policy of this State as established by the Legislature is opposed to appointment or retention of teachers in the public school system, who believe in or advocate the overthrow of the State or Federal Government by force or violence. *N. J. S. A.* 18:13–9.1, 9.2; 41:1–3; *Laba, supra,* at *pp.* 392, 393. So emphatic is the policy that if Dr. Kennelly, in a situation like the present one, asked a teacher if, within the previous five years, he had been a member of a group which believed in or advocated that type of overthrow of our government and he refused to answer relying on the Fifth Amendment, immediate discharge would be proper. *N. J. S.* 2A:81–17.1. In fact, the statute says that such refusal shall forfeit his employment, tenure or pension.

This court in *Lowenstein I* agreed with the remarks of Justice Heher in *Thorp v. Board of Trustees of Schools for Industrial Education,* 6 *N. J.* 498, 513 (1951), that "loyalty to government and its free democratic institutions is a first requisite for the exercise of the teaching function. Freedom from belief in force or violence as a justifiable weapon for the destruction of government is of the very essence of a teacher's qualification." The United States Supreme Court in *Adler v. Board of Education,* 342 *U. S.* 485, 72 *S. Ct.* 380, 96 *L. Ed.* 517 (1952), in discussing the matter of teacher loyalty, indicated plainly that "past conduct may well relate to present fitness; past loyalty may have a reasonable relationship to present and future trust." It said also:

"A teacher works in a sensitive area in a school room. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part

of ordered society, cannot be doubted." 342 *U. S.*, at *p.* 493, 72 *S. Ct.*, at *p.* 385.

Another factor to be recalled in the process of orientation for the reinterview, and which the record demonstrates was actually in the minds of the parties throughout the questioning, was the significance of the terms "Communism" and "Communist Party." *Laba* left no doubt on that score. The opinion said:

"The matter may no longer be viewed simply as one of academic freedom of thought and expression, for it has actually become one of self-preservation; we are convinced that Communism is an alien concept which is dedicated to the overthrowal of our form of government, by force if necessary, and seeks to deprive us of the very basic constitutional liberties which we all hold so dear; recent world happenings furnish further evidence of the futility of its solemn promises and the barbarism of its deliberate actions." 23 *N. J.*, at *p.* 388.

That view is not peculiar to this court. Both the United States Supreme Court and Congress have given expression to it; the former referred to it as "the long and widely accepted view." See *Barenblatt v. United States*, 360 *U. S.* 109, 128, 79 *S. Ct.* 1081, 3 *L. Ed. 2d* 1115, 1129 (1959).

Finally, and of equal importance to an understanding of the nature of the conference about to be held, it was necessary to be mindful that it was not a loyalty hearing. There was no charge by the Superintendent that Dr. Lowenstein was a Communist in 1955 or at the time of the interviews. (This vital circumstance quite obviously was not comprehended by at least one member of the Board of Education who voted to reinstate Lowenstein because the record made at the reinterview failed to sustain the charge that he was then a Communist.) The interviews were precipitated by his plea of the Fifth Amendment before the Congressional Committee which this court had said warranted an inquiry into his present fitness to teach. Their purpose was *to find out* if he was currently (in the sense explained) a member of the Communist Party or a believer in its disciplines.

In view of the background of the case, however, there must be some realistic approach to the Superintendent's problem. If such an interview began with questions as to present Communist Party membership or adherence to the disciplines and purposes of the Party, and a negative answer were received, I do not see how any reasonable judgment could be formed on the issue of the credibility of the denial without some further exploration. A "no" answer can be turned upside down and inside out and it remains the same bare word. Only when it is set up in a pertinent factual perspective, which will reasonably permit the formation of a value judgment of the "no," can the interview become meaningful.

At the outset of the reinterview now under consideration, Dr. Lowenstein asserted his loyalty to the principles underlying the government of the United States, and his opposition to Communism. Almost immediately, however, he again laid down the time barrier that ran through the 1957 conference, i. e., July 1953. Upon being asked how long prior to 1953 he held those views, he declined to answer.

As the questioning progressed, he said he did not know if the Communist Party was an international conspiracy, one of whose aims was to overthrow the government of the United States by force. He thought the United States Supreme Court had said that such was the purpose of the American Communist Party, and if the Court did so declare, he accepted it. Then he expressed the belief that in 1955 he probably thought that some members of the Communist Party could be loyal Americans; but he felt that because of changes in international relations in the past five years, fewer of such Party members could be loyal Americans in 1960. He knew nothing about any obligation on the part of Communists to deceive and cheat and generally break the rules of the game, and he wondered "what element of truth there may be in that." He indicated his belief that a Communist could be a fit person to teach in the Newark

public schools; that he could have the scholarship, teaching methodology and respect for the individual requisite for the position. He declined to answer whether he believed in 1955 that a Communist could possess and display the ethical standards that fit a person to teach in the public school system.

At this juncture, Dr. Kennelly, who had participated in all previous proceedings and so was thoroughly familiar with them, expressed doubt and skepticism as to Lowenstein's denial of current membership or subjection to its ideology. I repeat that such "current" connection with Communism in the framework of the case covers the period back to July 1953. The majority opinion does not attempt to define its use of "present" or "current" association; or to express any view as to whether the date fulcrum is May 19, 1955 or July 1953, or whether the date has moved progressively forward with each interview so that membership or subjection on the precise date of the last interview, September 2, 1960, would be the decisive point. In any event, whether Dr. Kennelly's doubt related to party membership or affiliation as of September 2, 1960, or as of any previous time back to 1953, plainly the doubt was engendered by Lowenstein's answers at the reinterview considered in the light of the previous history and background of the case. Whether the doubt was a reasonable one in that context now emerges as the crucial issue in the case. No one suggests that Dr. Kennelly's skepticism was motivated by bad faith or by anything other than a desire to discharge his responsibility as Superintendent of the Newark public school system. Moreover, neither the Board of Education, nor the State Commissioner of Education, nor this court would be justified in disregarding the statement of doubt as a matter of law, unless it can be said that the minds of reasonable, intelligent and conscientious officials would not differ as to whether the doubt was unreasonable. If that unqualified conclusion cannot fairly be reached, then Dr. Kennelly was justified (in fact obliged, see *Laba, 23 N. J.,* at *p.* 375; *Lowenstein I, 33 N. J.,* at *p.* 283) in pursuing the inquiry progressively back-

ward to the point of remoteness in an effort to resolve his doubt.

The statements of some members of the Board of Education at the close of the argument before them make it advisable to clarify the significance of the retrospective questioning and the possible end results of it. There were three possibilities. The further questions would (1) resolve Dr. Kennelly's doubt as to current (in the sense above indicated) Communist connection and produce a state of belief in Dr. Lowenstein's disavowal, (2) result in a charge of insubordination upon refusal to answer pertinent questions reasonably related to the resolution of the doubt, or (3), if the answers revealed sufficient evidence of current membership in the Party or advocacy of its ideology, justify a charge of unfitness to teach on that ground.

After giving voice to his doubt and to his desire to probe further, Dr. Kennelly inquired if Lowenstein had been a Communist, or subject to its ideology or believed in the Communist ideology, or had been a member of any Communist-front organization since 1950. All of these questions were met with a refusal to answer. Lowenstein's position was that the "cut off" period was July 1953; his counsel's objection was that such questioning was "out of bounds" under the decision of this court. The refusal resulted in a finding by Dr. Kennelly that Lowenstein was guilty of insubordination, conduct unbecoming a teacher, and that he had substantially impaired his usefulness as a teacher in the Newark school system.

When the matter came before the Board of Education those findings constituted the charge to be decided. It is again emphasized that there was neither charge nor finding that Lowenstein was currently a Communist; further, that to sustain Dr. Kennelly's findings the Board was not called upon to make any determination in that respect. The simple issue was: On the basis of the history and record of the case and the interrogation, was there a reasonable basis for Dr. Kennelly's feeling of doubt as to Dr. Lowenstein's dis-

avowal of current membership in or subjection to the principles of the Communist Party.

After lengthy argument and a second improper calling of Dr. Kennelly as a witness before the reviewing Board for cross-examination by Lowenstein's counsel, and some oral expression of views by some members of the Board, the charge was sustained by a 5 to 4 vote. Whatever may have been the oral utterances of the various members, which, except in the case of one member, plainly appeared to be extemporaneous, seven days elapsed before the final and detailed formal order of discharge was entered. And we were advised at the oral argument in this court that in the meantime counsel for the Board consulted with the members thereof with respect to the form and findings set forth therein and that the order represented their final action. The order says:

"It is the opinion and decision of this Board that the answers given in response to the Superintendent's questions, abstracted in the Schedule annexed, reasonably justified the doubts asserted by the Superintendent and the additional inquiry which he believed to be necessary by reason thereof."

On the basis of that conclusion, it adjudged Lowenstein guilty of unduly obstructing the Superintendent's inquiry by refusing to answer the questions relating to Communist connections between 1950 and July 1953.

The State Commissioner of Education was of the same view. He said:

"Considered against the background of the climate and environment of this case, the answers given by appellant to the Superintendent's inquiries fell short of achieving the purpose of the interview and were such as to raise a reasonable doubt as to appellant's fitness to teach, in the Commissioner's judgment. The need for further testing was thereby adequately established."

The majority of this court have now disagreed with the Superintendent, the Board of Education and the Commissioner of Education. To me the unfathomable aspect of

their opinion is the holding *as a matter of law* that the record is barren of any facts or inferences from facts which provide a reasonable basis for Dr. Kennelly's doubt about Lowenstein's current adherence to Communism. In effect, they say that on all the revealed material and the fair inferences therefrom there is no reasonable ground for difference of opinion among intelligent and conscientious officials as to the rationality of Dr. Kennelly's doubt. If the proceeding were a jury trial, the viewpoint of the majority would mean that the issue of whether a doubt was justified could not be submitted to the jury for determination; the question would have to be decided by the trial judge as a matter of law adversely to the assertion of reasonable doubt. Familiarity with past decisions of this court leaves me without doubt that less formidable factual settings have been held to require determination by a jury of the particular problem presented.

Let us look at the record to see if there is any reasonable basis to justify Dr. Kennelly's doubt about the veracity of Lowenstein's disavowal of current Communist Party membership or subjection to its disciplines.

At the September 2, 1960 reinterview, Lowenstein denied current membership in the Communist Party or belief in its ideologies or disciplines. (In this connection, an obvious fact must be kept in mind. In speaking of Communism, both Dr. Kennelly and Dr. Lowenstein meant the Communist Party belief in and advocacy of the overthrow of our government by force.) Likewise, he reaffirmed the position he had taken in that respect at the 1957 interview. He said that in 1955 he probably believed a Communist could be a loyal American and he expressed the view also that at the present time some of them could be such Americans. Further and more germane to the present inquiry, he indicated plainly that a Communist can be a fit person to teach in the public schools.

After hearing these answers the Superintendent, being conscious of the background of the case, expressed doubt as

to the credibility of the disavowal of Communism. He was uncertain in his own mind as to whether to accept it at face value and felt the need to probe further to resolve the uncertainty. The majority opinion seems to accept the Board's characterization of the answers referred to above as "unorthodox," but suggests that their very unorthodoxy makes "crystal clear" the truthfulness of his current rejection of Communism. My colleagues of the majority contrast what they call "stock" answers, *i. e.,* negative ones to the questions whether a Communist can be a loyal American or a fit teacher in a public school system, with Lowenstein's "unorthodox" ones, and find the latter more indicative of his truthfulness on the main issue. That conclusion in my judgment disregards certain fundamentals as well as the background of the case. The public policy of this State as promulgated by the Legislature and as enunciated by this court, denies a teaching post in the public school system to a Communist Party member. Moreover, Lowenstein's view that such a person can be a fit teacher brings to mind the comment of the United States Supreme Court in *Barenblatt, supra,* in connection with the right of a Congressional Committee to investigate Communism in the public school system and to interrogate teachers in that connection:

"To suggest that because the Communist Party may also sponsor peaceable political reforms the constitutional issues before us should now be judged as if that Party were just an ordinary political party from the standpoint of national security, is to ask this Court to blind itself to world affairs which have determined the whole course of our national policy since the close of World War II, * * *." 360 *U. S.,* at *p.* 128, 129, 79 *S. Ct.,* at *p.* 1094, 3 *L. Ed. 2d,* at *p.* 1130.

Further, in discussing Barenblatt's claim that the questioning violated the First Amendment of the Federal Constitution, the court said:

"Justification for its exercise in turn rests on the long and widely accepted view that the tenets of the Communist Party include the

ultimate overthrow of the Government of the United States by force and violence * * * ." *Id.*, 360 *U. S.*, at *p.* 128, 79 *S. Ct.*, at *p.* 1093.

What is there in the background which, in association with these "unorthodox" answers of Lowenstein, might reasonably stimulate a doubt as his denial of Party membership between July 1953 and September 1960? The beginning point is his reliance upon the Fifth Amendment before the Congressional Committee. Such plea is not proof of party membership but, as *Laba* taught, it reasonably called for a fitness inquiry in which he had a duty of cooperation and "an affirmative burden in the establishment of [his] fitness." Dr. Bella Dodd, a former Communist, had told the Committee under oath that she knew him as a Party member, who came to the meetings held in New York by the top committee of the Communists in the American Federation of Teachers. She said also that he was the most important member of the Communist group in the organization of teachers in the Party interest. Lowenstein denied the latter two portions of Dr. Dodd's testimony in the 1957 and 1960 interviews. He declined, however, to deny membership in the Party back of 1953.

It is not our function to make a final evaluation of the credibility of those conflicting declarations. They are simply a circumstance which plays a part in the justification for the Superintendent's inquiry. I do not agree, however, with the contention that in an inquiry of this type the passage of time since the early 1940's has emptied the circumstance of all significance. The bridging facts and inferences, even though not in great quantity, preserve Dr. Dodd's testimony as a factor in the total picture open to consideration by the Superintendent. In an investigation of Communist affiliation there must be some awareness that facts are hard to come by.

The phraseology employed by Lowenstein at the 1957 interview in denying membership after 1953 cannot be overlooked: "From the summer of 1953 on I have not been

a member of the Communist Party"; "at no time since the summer of 1953 have I been a member   *   *   *"; "after the summer of 1954 [and 1953] on I have not been a member or affiliated with the Ralph Fox Branch of the Communist Party." These statements did not come from the mouth of an uneducated, unintelligent man. The majority opinion describes him as a person of "acknowledged academic and pedagogical competence"; "obviously a person of independent mind, not given to forming or expressing opinions without being conscientiously convinced of the soundness and accuracy of the underlying facts." For purposes of our present problem, the significance of his disavowal of Party membership, "from the summer of 1953 on I have not been a member," etc., must be evaluated in the light of that appraisal of his mental acuteness and competence. On that basis and against the backdrop of Dr. Dodd's testimony, it seems plain that his statements are reasonably susceptible of the inference that he was a Communist Party member some time prior to, and perhaps even until, the summer of 1953. The majority deprecate Dr. Dodd's testimony, saying that it would never be received in a court of law. But we are concerned with an administrative proceeding, not a trial according to the common law. No declaration is made that her sworn assertions as to Lowenstein's active Communism do not supply a proper and competent basis for inquiry by the Superintendent as to present Party connection or belief in forceful overthrow of our government. In fact, the propriety of using information of this and of even less formal type is recognized in *Lowenstein I. 33 N. J.*, at *pp.* 286, 287. Such material is not used, nor could it be used, to prove the fact asserted; its function is limited, as it was here, to providing justification for interrogation of the teacher.

The suggested inference does not have to be drawn and the purpose of this dissent is not to say that it should be drawn. Nor is my purpose to assert that the inference represents the fact. But the inference is one which may

reasonably be drawn from the testimony and it was open to the Superintendent to accept it, if in the conscientious discharge of his public responsibility he felt that it was warranted.

It seems quite obvious that when the Superintendent became aware that Lowenstein presently feels that a Communist can be a loyal American citizen and that some of them can be fit teachers for the public school system, a doubt arose in his mind—an uncertainty—as to whether he should accept as truthful Lowenstein's disavowal of present allegiance to the Communist Party or its objective of overthrow of our government. The doubt found its generative force in the totality of the facts and the inferences that were available to him. The investigatory record was in a state akin to that which the United States Supreme Court, in *Konigsberg v. State Bar of California*, 81 *S. Ct.* 997 (1961), regarded as of "sufficient uncertainty" to justify questioning with respect to past Communist affiliations. At this point, it was not his burden to prove that Lowenstein is a Communist. The duty he owed to the public school system was to engage in a sincere effort to resolve his doubt as to Lowenstein's credibility. If in his discretion further interrogation was needed to aid him in that purpose, Lowenstein was under the obligation to cooperate in good faith in the endeavor.

In my opinion, the total record provides reasonable basis for Dr. Kennelly's assertion of doubt. Moreover, there is nothing to suggest that his doubt was not the product of good faith. Under the circumstances he was justified in propounding the additional questions as to membership in and activity for the Communist Party in 1950, and Lowenstein was properly subjected to the charge of insubordination and of impeding the investigation as a consequence of his refusal to answer. In the factual setting I cannot escape the conviction that the world would be a much better place to live in if those who assert their rights so vigorously would be equally responsive to their obligations.

The majority opinion does not limit its reversal of the discharge to a finding of absence of any basis for reasonable doubt as to the truthfulness of Lowenstein's disavowal of connection with the Communist Party or belief in its purpose to overthrow the government by force. It holds also that the decision of the Board of Education cannot stand because the oral statements given by two of its members at the close of the argument of counsel show that their votes were cast on grounds which were not within the scope of the charge against Lowenstein.

The criticized utterances came after a lengthy and confusing argument as to what was meant in our previous opinion by "present" Communist membership in the framework of the case. It was in that atmosphere that the first member, who is criticized by the majority of this court, remarked that he was "not making any decision so far as what the Supreme Court has said or hasn't said." Then he expressed his grave doubts as a father of school children that Lowenstein was "a normal American teacher." But those doubts came from this record. They have to mean that he too had doubts about the truthfulness of Lowenstein's disavowal of present Communism.

The second member whose vote to discharge is regarded as invalid said it was difficult for a layman to understand the legal technicalities discussed, and that he was going to base his decision on the moral issue involved. Then he proceeded to ask why, since "our courts have been so lenient as they should be * * * in defending a person, * * * Lowenstein should not be willing to bend backwards to give some information to help us decide some of these issues for the years preceding 1953." Does not that language reveal the mind of a layman who has doubt about Lowenstein's disavowal and who therefore wished to probe into the past?

In analyzing the two votes for dismissal, the majority refrained from commenting on the motivation for the votes for reinstatement as indicated by the oral comment. For example: One such member, who quite obviously came to

the meeting with a lengthy prepared statement, said it was the Superintendent's duty to substantiate the charge that Lowenstein was an active militant Communist "beyond any doubt in the minds of this tribunal." Such view can hardly be described as a product of the *Laba* or *Lowenstein I* opinions of this court. Another member who voted the same way obviously felt that Dr. Kennelly was charging Lowenstein with Communism rather than insubordination for refusing to cooperate in answering questions designed to find out if he was currently a Communist. She referred to the portion of our opinion in *Lowenstein I* which, in passing, said that dismissal of a teacher for disloyalty is not deserved unless the proof thereof is "abundant." Then she declared that the "burden of producing abundant proof had not been adequately discharged." She said also:

"I must say, frankly, that I feel Dr. Lowenstein has done irreparable damage to his value and usefulness in this system. While he cannot be judged for demanding his Constitutional rights, still one would rather wish that he had placed his responsibilities to his community and profession before those rights. As Dr. Lowenstein's own attorney stated to us—and I fear our school system will not be better for this display of legal fencing—I believe that such a victory for 'rights' is truly a hollow victory; almost a caricature of the Constitution [*sic*] right."

In the light of the quoted statement and of her misconception of the problem she was being called upon to decide, is it not plain that she too had doubts like those of Dr. Kennelly?

As I have already indicated, after these oral expressions had been voiced, counsel for the Board met with its members to prepare and put in proper form their findings of fact and order of dismissal. That document sustains Dr. Kennelly's finding of reasonable doubt about Lowenstein's credibility. Frequently a trial judge, in ruling on a motion or in deciding a case from the bench in summary fashion, will make statements that do not seem to dovetail with his subsequent written opinion or formal judgment. Yet absent

some most unusual circumstance, the written opinion or the final judgment would be treated as decisive on appeal. So, too, in the present situation, should not that course be followed, particularly since the oral statements criticized by the majority opinion on analysis can reasonably be regarded as consistent with and as supporting the basis for Dr. Kennelly's desire to move his interrogation of Lowenstein back to 1950? The oral comments of the two Board members I have spoken about, who voted to reinstate Lowenstein, apparently because they misconceived the issue to be resolved, should not provide any obstacle to the acceptance of the formal findings and order as the judgment to be reviewed by this court. These two members voted against dismissal either because they adhered to their orally announced impressions or because they did not agree with the formal expression of the views and findings of the majority of the Board.

But since such an appraisal of the final order may be regarded as legalistic, I do not rest my dissent upon the refusal of the majority of my colleagues to treat it as the repository of the Board's action. In my judgment, the question as to whether the order represents the final and understanding resolution of the precise issue to be decided ought to be remanded to the Board and not decided by this court. This is particularly so where reinstatement may expose the City of Newark to a liability of between $45,000 and $50,000. See, *N. J. S. A.* 18:3–28; 18:5–49.1. In 1957 when *Laba* was written, the contention was made that the remand for further interview ought to be to the State Commissioner of Education and not to the Newark Superintendent and Board of Education. On that occasion the court said:

"There is no substantial reason to believe that the local personnel is not sufficiently equipped to conduct a fair and impartial inquiry, or that it will fail to do so in compliance with the principles expressed by the State Commissioner and this court. The School Laws contemplate that where the general issue of fitness is presented the

original determination should be made locally with ample safeguards on review before the state school authorities and the courts." 23 *N. J.*, at *p.* 384.

That attitude was sound then and it is sound now. And it should represent the limit of this court's interference with the present Board of Education's order dismissing Lowenstein from the Newark public school system. True, the case has taken a long time and has reached this court three times, but there are important public and private rights involved and much as the delay is to be regretted, we should not allow impatience to interfere with proper original determination of the matter at the local level.

Remand need not be to the Superintendent; no further, interview is necessary. The existing record should be sent back to the Board with directions to answer two questions:

1. On the basis of the entire record, was there a reasonable basis for Dr. Kennelly's doubt as to the truthfulness of Dr. Lowenstein's disavowal of membership in the Communist Party or subjection to its disciplines subsequent to July 1953?

2. If so, was Dr. Lowenstein guilty of insubordination and improper obstruction of the investigation in refusing to answer questions relating to that subject for the period back to 1950?

If both questions produce affirmative answers, the Superintendent's charge was warranted and the dismissal of Dr. Lowenstein from the teaching staff would be proper.

For the reasons stated, I cannot agree with the majority opinion. Moreover, we must live beyond this case. If, on a record such as it brings to us, a Superintendent of a public school system has no right to press his interrogation beyond the limit now established, the interview formula so forthrightly announced in *Laba* has been emptied of all significant content.

Justice PROCTOR and Justice HANEMAN authorize me to say that they join in this dissent.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, HALL and SCHETTINO—4.

*For reversal and remandment*—Justices FRANCIS, PROCTOR and HANEMAN—3.