GEORGE B. THORP, PETITIONER-APPELLANT, v. THE BOARD OF TRUSTEES OF SCHOOLS FOR INDUSTRIAL EDUCATION OF NEWARK, NEW JERSEY, DEFENDANT-RESPONDENT.

Argued December 18, 1950, and January 2, 1951—Decided March 12, 1951.

500

502

*Mr. Emil Oxfeld* argued the cause for appellant. *Messrs. Rothbard, Harris & Oxfeld,* attorneys.

*Mr. Charles R. Hardin* argued the cause for respondent. *Messrs. Pilney, Hardin & Ward,* attorneys.

The opinion of the court was delivered by

HEHER, J. The question here is the constitutional sufficiency of chapter 23 of the Sessions Laws of 1949, which amends *R. S.* 18:13–9.1 and *R. S.* 18:13–9.2 to provide that every applicant for a license to "teach or supervise" in the public schools of the State, as a condition prerequisite to the issuance of a certificate to that end, and every "professor, instructor, teacher or person employed in any teaching capacity" who shall thereafter "be employed * * * by, or in," any college, university, teachers college, or other school in New Jersey "supported in whole or in part by public funds, directly or through contract or otherwise with the State Board of Education, * * * before entering upon the discharge of his or her duties," shall subscribe to the "oath of allegiance and office" prescribed by *R. S.* 41:1–3, as amended by chapter 22 of the Session Laws of 1949. *P. L., pp.* 68, 70. The oath is in terms following:

"I, ————————————, do solemnly swear (or affirm) that I will support the Constitution of the United States and the Constitution of the State of New Jersey, and that I will faithfully discharge the duties of ————————————, according to the best of my ability.

"I do further solemnly swear (or affirm) that I will bear true faith and allegiance to the Constitution of the United States and the Constitution of this State and to the Governments established in the United States and in this State, under the authority of the people; and will defend them against all enemies, foreign and domestic; that I do not believe in, advocate or advise the use of force, or violence, or other unlawful or unconstitutional means, to overthrow or make any change in the Government established in the United States or in this State; and that I am not a member of or affiliated with any organization, association, party, group or combination of persons, which approves, advocates, advises or practices the use of force, or violence, or other unlawful or unconstitutional means, to overthrow or make any change in either of the Governments so established; and that I am not bound by any allegiance to any foreign prince, potentate, state or sovereignty whatever. So help me God."

Plaintiff was employed by the defendant board of trustees as a "special lecturer" in mechanical engineering at its Newark College of Engineering for the Spring semester beginning February 1, 1950, and concluding June 15 ensuing, for a total compensation of $1,800, payable in equal semi-monthly installments. At the time of his employment, plaintiff was an experienced teacher and a specialist in the fields of mechanical and aeronautical engineering. On February 17, 1950, after four days of teaching under the contract, the trustees requested plaintiff to take and subscribe the prescribed statutory oath; but a week later he declined, in writing, on the ground that this legislative requirement infringed upon "the rights of private citizens as guaranteed" by the Federal and State Constitutions. On March 9 following, his teaching employment was for that reason terminated by the trustees, although he was retained in a non-teaching capacity for the remainder of the contract term at the same salary. The Newark College of Engineering is under the management and control of the trustees, but is supported wholly or in part by public funds, according to an arrangement made with the State Board of Education. The trustees constitute a body corporate under chapter 164 of the Session Laws of 1881. *P. L., p.* 208; *R. S.* 18:15–17 *et seq.*

The action of the trustees was sustained on appeal by the State Commissioner of Education and the State Board of

Education. Plaintiff's appeal to the Appellate Division of the Superior Court was certified here for decision on our own motion.

## I.

First, it is contended that the oath of allegiance thus directed qualifies the oath prescribed for state officers by Article VII, Section I, paragraph 1 of the Constitution of 1947, and the act is therefore, in this respect at least, unenforceable as a legislative interference with an exclusive constitutional prescription and an enlargement of constitutional qualifications within the principle of *Imbrie v. Marsh,* 3 *N. J.* 578 (1950). We think not.

Teaching is a profession; and in New Jersey the practitioners of the profession in the public school system are not deemed public officers. At the outset, the relationship between the public school teacher and the school authority is contractual in nature. The attainment of the tenure provided by *R. S.* 18:13-16 and *R. S.* 18:13-17 does not convert the teacher's employment into a public office. Tenure as therein ordained is a mere "legislative status" subject to legislative alteration and annulment. *Greenway v. Board of Education of Camden,* 129 *N. J. L.* 46 (*Sup. Ct.* 1942) ; affirmed, *Ibid.* 461 (*E. & A.* 1943) ; *Offhouse v. State Board of Education,* 131 *N. J. L.* 391 (*Sup. Ct.* 1944); *appeal dismissed,* 323 *U. S.* 667, 65 *S. Ct.* 68, 89 *L. Ed.* 542 (1944). Teaching in the public schools does not involve the exercise of governmental powers, either of the State or the school district, and so the teacher is not an officer either of the State or the local corporate body, and, *a fortiori,* this is true of plaintiff, who held a contract of employment with the defendant trustees and not with the State or a local school district, though the school was conducted by a public corporation and was supported by public funds.

An office is a place in a governmental system "created or recognized by the law of the state which, either directly or by delegated authority, assigns to the incumbent thereof

the continuous performance of certain permanent public duties"; a position is analogous to an office "in that the duties that pertain to it are permanent and certain, but it differs from an office, in that its duties may be nongovernmental and not assigned to it by any public law of the State"; and an employment differs from both an office and a position "in that its duties, which are nongovernmental, are neither certain nor permanent." *Fredericks v. Board of Health, 82 N. J. L.* 200 (*Sup. Ct.* 1912). The test of a public office is whether the incumbent is "invested with any portion of political power partaking in any degree in the administration of civil government, and performing duties which flow from the sovereign authority." *City of Hoboken v. Gear, 27 N. J. L.* 265 (*Sup. Ct.* 1859). An office partakes in some degree of political power or governmental authority; a position is an employment "not calling for the exercise of governmental authority." *Dolan v. Orange, 70 N. J. L.* 106 (*Sup. Ct.* 1903). See, also, *Uffert v. Vogt, 65 N. J. L.* 377 (*Sup. Ct.* 1900); *Duncan v. Board of Fire and Police Commissioners of Paterson, 131 N. J. L.* 443 (*Sup. Ct.* 1944). There is general acceptance of the view that tenure does not serve to render the teacher's employment a public office. *E. g., Kennedy v. Board of Education, 82 Cal.* 483, 22 *Pac.* 1042 (1890); *Kostanzer v. State, 205 Ind.* 536, 187 *N. E.* 337 (1933). See, also, 110 *A. L. R.* 800; 75 *A. L. R.* 1352.

▇ ▇ Nor does the constitutional direction of Article VIII, Section IV, paragraph 1 of the Constitution of 1947, that the Legislature provide "for the maintenance and support of a thorough and efficient system of free public schools" constitute those employed to give instruction in the schools public officers, either of the State or the local authority. Teachers so employed do not exercise what is in essence governmental authority.

## II.

The statute is also assailed as an invasion of "areas of freedom" which are inviolable under the Bill of Rights embodied

in the First Amendment of the Federal Constitution, secured against adverse state action by the Fourteenth Amendment, and Article I, paragraphs 6, 18 and 21 of the State Constitution of 1947, and as an unconstitutional interference with plaintiff's "right or privilege to follow the profession of a teacher."

More specifically, it is said that the statutory proscription trespasses upon the sacred domain of belief, even though the subject matter be a settled conviction entertained by one who would teach and instruct youth of the right to overthrow or change the established federal or state government by force or violence or other unlawful or unconstitutional means. This legislative directive is challenged as an unconstitutional "throttling of any unorthodox philosophy which must inevitably flow from such proscription."

"Beliefs are inviolate." *American Communications Association v. Douds*, 339 *U. S.* 382, 70 *S. Ct.* 674, 94 *L. Ed.* 925 (1950). The First Amendment of the Federal Constitution gives "freedom of mind the same security as freedom of conscience." *Thomas v. Collins*, 323 *U. S.* 516, 65 *S. Ct.* 315, 89 *L. Ed.* 430 (1945). It is of the very essence of the freedoms guaranteed by the First Amendment that opinions or beliefs not manifested by an overt act shall not be the subject of criminal sanctions. Unorthodox thoughts as such may not be rendered punitive. There cannot now be punishment for the harboring of illicit beliefs and thoughts as was the case at the early common law. The Constitution, Federal and State, forbids. But the fundamental civil liberties here involved are not absolute. The particular guarantee of freedom of thought and opinion by the First Amendment is not free of all qualification. Government has the inherent right of self-protection against the forces that would accomplish its overthrow by violence. It is of the very nature of the social compact that the individual freedoms at issue here are subject to reasonable restraint in the service of an interest deemed essential to the life of the community. *Prince v. Commonwealth of Massachusetts*, 321 *U. S.* 158, 64 *S. Ct.*

438, 88 *L. Ed.* 645 (1944). As was said by the late Chief Justice Hughes, "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses." *Cox v. New Hampshire,* 312 *U. S.* 569, 61 *S. Ct.* 762, 85 *L. Ed.* 1049, 133 *A. L. R.* 1396 (1941). The question is whether the statutory proscriptions bear a reasonable relation to the apprehended public evil. Where a regulation in the interest of public order results in an indirect partial abridgement of civil rights, the inquiry is as to which of the two conflicting interests demands the greater protection in the circumstances. The incidental limitation of personal freedoms is justifiable where necessary in the service of an overriding public interest. *American Communications Association v. Douds, supra.*

True, our own government had its genesis in revolution; but it is nevertheless of the genius of our free society embodied in the federal compact that changes in government shall be accomplished by orderly and lawful processes. It goes without saying that anarchic and kindred methods are alien to the spirit of our institutions. However natural law may justify revolt against tyranny, our democratic society is grounded upon the principles of liberty and order; and the preservation of our free institutions and the governmental structure that sustains them is a primary responsibility of government. Self-protection against "unlawful conduct" and, in some circumstances, against "incitements to commit unlawful acts" is so deeply infixed as to be an attribute of government. *American Communications Association v. Douds, supra.*

In the exercise of the basic right of self-preservation, government may act against the erosive forces that would first undermine its structure and then accomplish its overthrow by force. It may move to restrain hostile action; and it may act to avert the perils of subversive influences, however they may seek to infiltrate and prostitute governmental processes to their own evil ends. A government not so em-

powered would hardly be worthy of the name. Self-preservation is a natural law. In a democracy such as ours, it is a principle of order derived from the consent of the governed. These fundamental personal freedoms are themselves "dependent upon the power of constitutional government to survive." *American Communications Association v. Douds, supra.*

The accommodation of the state's discretion to take measures for the protection of its essential welfare and the superior interest shielded by the federal compact is always a delicate exercise. *Cantwell v. Connecticut,* 310 *U. S.* 296, 60 *S. Ct.* 900, 84 *L. Ed.* 1213 (1940); *Schneider v. Irvington,* 308 *U. S.* 147, 60 *S. Ct.* 146, 84 *L. Ed.* 155 (1939). It is said that the restriction of these civil liberties is supportable only "by clear public interest, threatened not doubtfully or remotely, but by clear and present danger"; and that "Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation."—citing *Thomas v. Collins, supra.* See, also, *Schenck v. United States,* 249 *U. S.* 47, 39 *S. Ct.* 247, 63 *L. Ed.* 470 (1919). But in the *Douds* case cited *supra,* the requirement of a somewhat similar oath by officers of labor unions (more specific and broader in its terms in that it called also for a sworn denial of membership in or affiliation with the Communist Party), as a condition to the use of the remedial measures and advantages afforded by the Federal Labor Management Relations Act of 1947. (29 *U. S. C.,* § 159(h), 29 *U. S. C. A.,* § 159(h)), was sustained as a measure reasonably necessary for the protection of interstate commerce against the "political strike." In addition to sworn disavowal of membership in the Communist Party, the statute there prescribes an oath that the affiant union officer "does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods"; and it was found that the oath was sustainable as applicable "to persons and organizations who believe in violent overthrow of the Govern-

ment as it presently exists under the Constitution as an objective, not merely a prophecy." The rationale of the view expressed by Chief Justice Vinson is to be found in this holding: "Congress might well find that such persons—those who believe that the present form of the Government of the United States should be changed by force or other illegal methods—would carry that objective into their conduct of union affairs by calling political strikes designed to weaken and divide the American people, whether they consider actual overthrow of the Government to be near or distant. It is to those persons that § 9 (h) is intended to apply, and only to them. We hold, therefore, that the belief identified in § 9 (h) is a belief in the objective of overthrow by force or by any illegal or unconstitutional methods of the Government of the United States as it now exists under the Constitution and laws thereof." Apropos of the "clear and present danger" doctrine as related to the particular circumstances, the Chief Justice said: "When the effect of a statute or ordinance upon the exercise of First Amendment freedoms is relatively small and the public interest to be protected is substantial, it is obvious that a rigid test requiring a showing of imminent danger to the security of the Nation is an absurdity."

The oath ordained by the New Jersey statute is but an extension and elaboration of the traditional oath of allegiance in matters considered by the Legislature vital to the essential common security. See the dissenting opinion of Mr. Justice Oliphant in *Imbrie v. Marsh, supra.* The purpose of the oath is not to probe the mind of the teacher for the punishment of unorthodox or heretical views and beliefs, however inimical to the welfare and safety of the established government, but rather to determine the teacher's qualifications for the instruction of youth in the public schools. The test is largely subjective to forestall hostile action in an area deemed vital to the community. There is no interdiction upon the freedom of opinion, no effort to control thought, no censorship nor invasion of the sphere of conscience in matters of religion. The aim is not to stifle beliefs as such, but to dis-

qualify for teaching one who, however capacitated otherwise, believes in the objective of overthrow of the government, Federal or State, by force or violence or other unlawful means. There is no mandate against the entertainment of unorthodox beliefs, and no personal penalty for nonconformity. One so mentally conditioned is deemed unsuited for the instruction of youth in the schools supported by public funds; and one who refuses to abjure such belief suffers the disqualification. This constitutes an entirely reasonable accommodation of the fundamental personal rights and the common interest in the safety of Government and the integrity of its educational processes. The Legislature might well find that the teacher would carry that objective into his teaching. Thus, there is no undue infringement of civil liberties; no more than is needful for the essential public welfare. Paraphrasing the classic language of Justice Holmes in *McAuliffe v. New Bedford, 155 Mass. 216* (1892), the plaintiff may have a constitutional right to his belief in the overthrow of government by force or violence, but he has no constitutional right to be a teacher in the public schools. Of course, there can be no undue discrimination or arbitrary exclusion. The First Amendment "requires that one be permitted to believe what he will. It requires that one be permitted to advocate what he will unless there is a clear and present danger that a substantial public evil will result therefrom. It does not require that he be permitted to be the keeper of the arsenal." *American Communications Association v. Douds, supra.*

There are other cases which exemplify the principle. In *United Public Workers v. Mitchell, 330 U. S. 75, 69 S. Ct. 556, 91 L. Ed. 754* (1946), a statute forbidding participation in partisan political activities by employees of the Federal Government, a right secured by the First Amendment, if they would remain in the federal service, was sustained as consistent with that Amendment, in that there was a rational connection between the prohibitions of the statute and the end to be served, and the abridgement of the personal rights secured by the Amendment was of limited scope to further a large public interest in the efficiency of government service.

Also, a state court's refusal of admission to its bar of a person otherwise qualified, on the ground that he had conscientious scruples against war and would not take up arms or resort to force to prevent wrong under any circumstances, was upheld for the reason that the applicant could not in good faith swear to support the state constitution, which called for service in the militia in time of war. The relation between the obligations of membership in the bar and service required by the state in time of war, the limited effect upon speech and assembly, and the state court's strong interest in the persons who become officers of the court, were deemed sufficient justification for the state action. *Re Summers,* 325 *U. S.* 561, 65 *S. Ct.* 1307, 89 *L. Ed.* 1795 (1945). And a state statute requiring students at the state university to take a course in military science and tactics was held valid as against the contention that its enforcement would abridge the privileges and immunities and the liberty secured by the Fourteenth Amendment. The Supreme Court said: "Government, federal and state, each in its own sphere owes a duty to the people within its jurisdiction to preserve itself in adequate strength to maintain peace and order and to assure the just enforcement of law." *Hamilton v. Regents of the University of California,* 293 *U. S.* 245, 263, 55 *S. Ct.* 197, 79 *L. Ed.* 343 (1934).

The maintenance of the purity of the educational process against corruption by subversive influences is of the highest concern to society. It is in no real sense a denial of academic freedom to require of a teacher, as a condition to employment, a sworn disavowal of allegiance to the doctrine of force or violence as a mode of overthrowing government. That would seem to be axiomatic. Loyalty to government and its free democratic institutions is a first requisite for the exercise of the teaching function. Freedom from belief in force or violence as a justifiable weapon for the destruction of government is of the very essence of a teacher's qualifications. The apprehended danger is real and abiding. We have long had evidences of the pressure here of a godless ideology ruthlessly fostered by a foreign power which has for its aim the violent overthrow of government and free society. And one

of its weapons is the debasement of teaching as a softening measure in the consummation of the subversive process. The school system affords the opportunity and means for subtle infiltration. There is no intrusion upon personal freedoms when government intervenes, as it has here, to avert this peril to its very existence. A teacher who is bereft of the essential quality of loyalty and devotion to his government and the fundamentals of our democratic society is lacking in a basic qualification for teaching. The teacher is not obliged to take the oath; but if he refuses to do so he is not entitled to teach. In the current struggle for men's minds, the State is well within its province in ensuring the integrity of the educational process against those who would pervert it to subversive ends.

The design of the statute is to obviate the danger of the translation of such beliefs into teachings. There is of necessity a close association between belief in force and teaching which is intimately related to fitness. One may not divorce one's beliefs from one's teaching. The Legislature may secure youth against indoctrination in the alien ideology of force and violence; and reasonable measures to that end are not obnoxious to the First Amendment. It may do whatever is required in the interest of youth and the common welfare. *Prince v. Commonwealth of Massachusetts, supra.* The incidental qualification of personal freedoms is a necessary concession to the basic interests of society. It is a legislative function to appraise the need and determine the remedy.

Freedom of thought is a cherished right. It is in the nature of a free people to treasure absolute freedom of mind; but this liberty would have no significance whatever if the society which gave it being ceased to exist, and the principle is *ex necessitate* subject to measures essential to its own security. To challenge the validity of this proposition is to deny the power of government to maintain its very existence. Civil liberties cannot be made the open door to subversive penetration. Unless the State may act to preserve the basic freedoms now invoked to stay its hand, those freedoms would hold in themselves the seeds of their own frustration.

## III.

Finally, it is urged that the statute is unenforceable as in contravention of the personal liberties secured by the Fourteenth Amendment for "vagueness and indefiniteness" and for insufficiency in the definition of "the standard of guilt"; and that the oath prescribed constitutes a bill of attainder and an *ex post facto* law in violation of Article IV, Section VII, paragraph 3 of the State Constitution of 1947. Neither of these contentions is well made.

As to the first, the specific point made is that the word "affiliated" related to the phrase "any organization, association, party, group or combination of persons" which hold to the views made the ground of disqualification is vague and uncertain and deficient in a "definable standard by which the association can be definitively fixed," and is also obnoxious as the embodiment of "the doctrine of guilt by association."

But a criminal prosecution for the making of a false oath would not be maintainable unless the false swearing was willful and corrupt. *R. S.* 41:3–1. Thus, there is a reasonably ascertainable standard of guilt comporting with the requirements of due process. The same contention was made in the *Douds* case cited *supra*. Chief Justice Vinson said: "The question in any criminal prosecution involving a non-Communist affidavit must therefore be whether the affiant acted in good faith or knowingly lied concerning his affiliations, beliefs, support of organizations, etc. And since the constitutional vice in a vague or indefinite statute is the injustice to the accused in placing him on trial for an offense, the nature of which he is given no fair warning, the fact that punishment is restricted to acts done with knowledge that they contravene the statute makes this objection untenable. * * * Without considering, therefore, whether in other circumstances the words used in § 9 (h) would render a statute unconstitutionally vague and indefinite, we think that the fact that under § 35 A of the Criminal Code no honest, untainted interpretation of those words is punishable removes the possibility of constitutional infirmity."

■ The second contention is likewise untenable. There is no punishment laid down for past actions, such as in *Cummings v. Missouri*, 4 *Wall* 277, 18 *L. Ed.* 356 (1866); *Ex parte Garland*, 4 *Wall* 333, 18 *L. Ed.* 366 (1887); *United States v. Lovett*, 328 *U. S.* 303, 66 *S. Ct.* 1073, 90 *L. Ed.* 1253 (1946). The distinction was made in the *Douds* case. Referring to the above cases, the Chief Justice said: "Those cases and this also, according to the argument, involve the proscription of certain occupations to a group classified according to belief and loyalty. But there is a decisive distinction: in the previous decisions the individuals involved were in fact being punished for past actions; whereas in this case they are subject to possible loss of position only because there is a substantial ground for the congressional judgment that their beliefs and loyalties will be transformed into future conduct. * * * Here the intention is to forestall future dangerous acts; there is no one who may not, by a voluntary alteration of the loyalties which impel him to action, become eligible to sign the affidavit. We cannot conclude that this section is a bill of attainder." Here, also, the teacher becomes qualified by taking the oath.

The judgment of the State Board of Education is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For reversal*—None.