76 N.J. Super. 493 (1962)
185 A.2d 21
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LOIS CONGDON AND NEAL MOSHER, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 1962.
Decided October 16, 1962.
*496 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Emerson L. Darnell argued the cause for appellants.
Mr. Bertram Polow, First Assistant Prosecutor, argued the cause for respondent (Mr. Frank C. Scerbo, Morris County Prosecutor, attorney).
The opinion of the court was delivered by FREUND, J.A.D.
Defendants appeal from a conviction in Morris County Court for a violation of N.J.S.A. App.A:9-49(f) of the Disaster Control Act, N.J.S.A. App.A:9-30 et seq. Section 49(f) provides that anyone refusing to obey the lawful orders of authorized civil defense personnel shall be adjudged a disorderly person.
On April 28, 1961 the Division of Civil Defense in the New Jersey Department of Defense conducted a state-wide *497 civil defense practice drill known as "Operation Alert 1961." This drill was part of a national program cooperated in by federal, state and local governments, as well as the public at large.
Although no specific proclamation was issued by the Governor pertaining to "Operation Alert 1961," on March 10, 1955, the Governor by proclamation set up the Civil Defense and Disaster Control Plan, binding upon every person in the State. On February 23, 1961 the Acting State Director of Civil Defense and Disaster Control promulgated "Informational Bulletin No. 212" describing "Operation Alert 1961."
The student body at Drew University, Madison, N.J., had been informed of this air raid drill several days before April 28. A notice of participation by the university was directed to the entire student body and posted, along with detailed instructions and reference to the Disaster Control Act, including its penalty provisions. This notice included a detailed description of the air raid signals, in addition to the statement that failure to take cover might result in conviction as a disorderly person, with possible imprisonment up to a year or a fine up to $175, or both. Two faculty members were officially designated as "Civil Defense and Disaster Control Coordinators" for the university.
Defendants Lois Congdon and Neil Mosher were students at Drew University at the time of this drill. They had helped form a student organization called "ARROW" (Associated Realists Resisting Organization for War), whose general purpose was to demonstrate its members' belief in the deleterious effects and futility of civil defense. In particular, its immediate purpose was "to deal with the April 28 exercises."
Prior to this date, ARROW representatives circulated a leaflet which urged participation in a "campus protest against civil defense." The form of this protest was for students to attend an open air meeting before the sounding of the sirens and, after the take cover signal, either to distribute ARROW handbills in shelter areas or to remain at the *498 site of the meeting. The leaflet noted the penalties imposed by law for failing to take cover but added that "legal counsel suggests that there is a serious question as to whether in fact the law can be made to apply to our situation." It concluded with a statement that ARROW's "activities are carried out under a discipline of non-violence which includes a respect for the structure of law itself most deeply when we are obliged not to comply with an individual law, for conscience' sake."
Additional information issued by ARROW included "A Resolution Concerning Civil Defense, Approved by The First Annual Meeting of The General Board of Christian Social Concerns of The Methodist Church." This resolution speaks of the horrors inherent in nuclear and bacteriological warfare and states that civil defense aids the cause of war by spreading fear and hatred through its preparation for inevitable attack. The closing paragraph of the resolution calls upon all who have "a Christian concern for the welfare and peace of all mankind" to work for "a world at peace."
A final document issued by ARROW was "A Statement of Intention and Purpose Concerning Civil Defense" which defendants urged others to sign prior to their refusal to take part in the air raid drill in question. This statement reiterates the doctrine of the preceding resolution concerning the "functional futility of civil defense." Pledging adherence to "the nonviolent technique of active resistance as personified by such leaders as Martin Luther King and Mahatma Gandhi * * *," the statement compares its "sit-out" challenge to the law with the contemporary "sit-in" demonstrations in the South and those who resisted the "law of the land" in the ante-Civil War underground railroad. Although the statement notes that nonparticipation in the drill may result in litigation testing the validity of the allegedly ambiguous civil defense statute, the "sit-out" participants expressly assume full responsibility for their actions. The concluding sentence of the statement notes that their "primary motivation" is "to follow the leadings of conscience."
*499 On April 28, after the sounding of the air raid signal called for by "Operation Alert 1961," defendants and five other students remained quietly seated on the university grounds. They refused to take cover when specifically requested to seek protection in a nearby building by Drew University's civil defense and disaster control co-ordinators.
Defendants were charged on May 4, 1961 with violation of N.J.S.A. App.A:9-49(f), (g), and (h) in a complaint signed by the Director of Civil Defense and Disaster Control for Madison. At a trial in the municipal court on May 18 defendants were found guilty of violating subsections (f) and (g) and fined $25, plus costs. On appeal to the Morris County Court both defendants were found guilty of violating only subsection (f), but the fine was raised to $50, plus costs. Consequently, the only provision we need examine is N.J.S.A. App.A:9-49(f), which reads as follows:
"Any person who shall:

* * * * * * * *
(f) Refuse to obey the lawful orders of any air raid warden, civilian protection worker, or other person who is duly authorized to perform any act or function during the threat or imminence of danger or any emergency * * * shall be adjudged a disorderly person and shall be punished by imprisonment in the workhouse, penitentiary or county jail for a term not exceeding one year or by a fine not exceeding one hundred seventy-five dollars ($175.00), or by both such fine and imprisonment, in the discretion of the court."
On the present appeal, defendants argue that this subsection of the statute applies only during a time of actual or threatened emergency and that the order given to them was not a "lawful order" within the meaning of the statute. In addition, they make four constitutional challenges to the validity of the statute: vagueness resulting in a denial of due process, improper delegation of legislative functions, and violation of the freedoms of speech and of religion.
A threshold question is whether or not the defendants' conduct on April 28 came within the wording of subsection (f) Specifically, defendants maintain that this subsection *500 should be read with the "during" phrase modifying the word "orders" rather than the enumeration of civil defense personnel which immediately precedes it. The resultant meaning which defendants urge is that subsection (f) is operative only in time of actual or impending emergency.
In construing allegedly ambiguous sections of a statute, a reasonable interpretation should be made based on the legislative purpose as revealed by the composite thrust of the whole statute. Alexander v. New Jersey Power & Light Co., 21 N.J. 373, 378 (1956); 2 Sutherland, Statutory Construction (3d ed. 1943) § 4703, p. 336. Although penal statutes are to be strictly construed, legislative purpose should not be disregarded. State v. Edwards, 28 N.J. 292, 298 (1958). Applying these principles to the statute in question, we find that the Legislature has clearly stated that the "purpose of this act is to provide for the health, safety and welfare of the people of the State of New Jersey and to aid in the prevention of damage to and destruction of property during any emergency * * *." N.J.S.A. App.A:9-33. (Emphasis added.) The themes of preparation and prevention recur in the structure of the Disaster Control Act. For example, N.J.S.A. App.A:9-45(c) provides that the Governor is empowered to make necessary orders, rules and regulations
"concerning the organization, recruiting, training, conduct, duties and powers of voluntary agencies, including air raid wardens, auxiliary police and firemen, demolition and clearance crews, fire watchers, road repair crews, rescue squads, medical corps, nurses' aides corps, decontamination squads, drivers' corps, messengers' corps, emergency food and housing corps, utility repair squads, and all other civilian protection forces exercising or performing any functions or duties in connection with the problems of local civilian defense or disaster control." (Emphasis added.)
The interpretation which renders any part of a statute ineffective should be avoided. O'Rourke v. Bd. of Review, 24 N.J. 607, 610-11 (1957); State v. Sperry & Hutchinson Co., 23 N.J. 38, 46 (1956); Maplewood v. *501 Tannenhaus, 64 N.J. Super. 80, 86 (App. Div. 1960), certif. denied 34 N.J. 325 (1961). Clearly, a program for the alleviation of the results of disaster derives its efficacy from organization and drill before the emergency arises.
The 1955 proclamation of the Governor, issued pursuant to this act and setting forth the Civil Defense and Disaster Control Plan, demonstrates the continuing concern with preparation:
"WHEREAS, disasters may occur at any time and are not limited to periods of international tension or war;
WHEREAS, predisaster planning and training is essential in the reduction of the effects of disasters upon the citizens and their property; * * *."
Practical interpretation of a statute by administrators over a period of time may be utilized in explaining doubtful phrases or in illuminating obscurity. Lane v. Holderman, 23 N.J. 304, 322-323 (1957), affirming 40 N.J. Super. 329, 336 and 338 (App. Div. 1956); Harper v. New Jersey Manufacturers Casualty Insurance Co., 1 N.J. 93, 98-99 (1948); 2 Sutherland, Statutory Construction, supra, § 5109, pp. 523 et seq.
That the Legislature chose in 1953 to pass the original 1942 Disaster Control Act in very slightly modified form strengthens the suggestion that the intent of the Legislature was not to wait until the community had been struck by the holocaust of modern warfare before civil defense measures could become effective. We may take judicial notice of the contemporary conflicts in international relations, the increased range and tempo of destruction inherent in modern weapons, and the necessity of government to plan for the protection of its citizens under these circumstances. McCormick on Evidence (1954) § 324, pp. 689 et seq.; 9 Wigmore on Evidence (3d ed. 1940) § 2580, pp. 571 et seq.
The very wording of the statute under consideration tends to reject defendants' interpretation. The position of the "during" clause at the end of the sentence identifies the nature of the office and does not limit the civil defense personnel's *502 authority to actual existing emergencies. The opposite conclusion violates not only the clear wording of the draftsmen but also the principle of statutory construction that referential and qualifying phrases refer solely to the last antecedent  where no contrary intention appears. U.S. ex rel. Santarelli v. Hughes, 116 F.2d 613, 616 (3 Cir. 1940); 2 Sutherland, Statutory Construction, supra, § 4921, pp. 448-9; 82 C.J.S. Statutes § 334, p. 670 et seq. As has already been demonstrated, the context and pervading intention in this instance support such an interpretation. Consequently, we find that N.J.S.A. App.A:9-49(f) is not limited to a time of actual or threatened emergency and may properly apply to the preparatory drill in the present case.
Defendants contend that the commands made by the Civil Defense and Disaster Control Co-ordinators were not "lawful orders" within the meaning of N.J.S.A. App.A:9-49(f). According to defendants, there is no statutory authority for the civil defense personnel to compel the general public to take shelter in the course of an air raid drill. Defendants admit that N.J.S.A. App.A:9-45(b) provides for the issuance of orders, rules and regulations by the Governor
"On matters pertaining to air raid warnings and air raids and the conduct of the civilian population during the alert period of an air raid or of a threatened or impending air raid and during and following any air raid."
However, defendants attempt to limit the application of this subsection to actual air raids and maintain that it has no application to a preparatory exercise or drill.
In view of the preceding discussion demonstrating that prevention and preparation are necessary, vital and valid functions of the Disaster Control Act, a perfectly reasonable interpretation of subsection (b) is that exercises and drills are matters pertaining to air raids. Such an interpretation is strengthened by reference to subsections (i) and (j) under which the Governor may issue orders, rules and regulations:
*503 "i. On any matter that may be necessary to protect the health, safety and welfare of the people or that will aid in the prevention of loss to and destruction of property.
j. Such other matters whatsoever as are or may become necessary in the fair, impartial, stringent and comprehensive administration of this act." (Emphasis added)
On the facts here present, it is significant that subsection (f) of N.J.S.A. App.A:9-45 provides that the Governor may regulate "the method of meeting threatened air raid danger insofar as it affects the children in our schools." None of these subsections is expressly limited to periods of threatened or immediate danger. Indeed, all the orders, rules and regulations provided for by the statute can have value and meaning only if the populace has had the experience which comes from tests and training.
Defendants further argue that regulations were not properly issued under which they could be compelled to take shelter during the drill. This argument overlooks the fact that the Governor by proclamation in 1955 established the Civil Defense and Disaster Control Plan which was "binding upon each and every person" within this State, N.J.S.A. App.A:9-45. That proclamation included an outline for practice procedures. These procedures were implemented for "Operation Alert 1961" by "Informational Bulletin No. 212" issued on February 23, 1961 by the Acting State Director of Civil Defense and Disaster Control. This bulletin states that as part of the warning exercise "Coincident with the Conelrad Drill and air raid warning there will be a Take Cover drill from approximately 1600 hours to 1610 hours during which traffic will be halted and the public will take shelter." (Emphasis added.) Against the background of the extensive program called for "Operation Alert 1961" the statement that "the public will take shelter" was not the expression of a pious wish but rather a clear-cut directive.
In their final challenge to the "lawfulness" of the orders under N.J.S.A. App.A:9-49(f), defendants claim that "Informational Bulletin No. 212" does not inform them of *504 the penalties applicable for a failure to take cover and that the term "take cover" itself is not defined. Defendants also claim that the Disaster Control Act and the orders issued pursuant to that act are so vague as to constitute a denial of due process violative of both N.J. Const. 1947, Art. I, par. 1, and U.S. Const., Amendment 14, § 1. In view of the similarity of this due process argument with the remaining problem concerning the lawfulness of the orders, these two arguments will be combined for discussion.
The penalty provisions are clearly set forth in N.J.S.A. App.A:9-49 of the Disaster Control Act which provides the framework for the 1955 proclamation and the 1961 bulletin. Drew University posted and circulated a notice several days prior to the air raid drill warning the students that
"Failure to obey the instructions of your Drew University Civil Defense Coordinators or failure to take cover or stay put while the TAKE COVER signal is in effect may result in your being `adjudged a disorderly person and ... punished by imprisonment in the workhouse, penitentiary or county jail for a term not exceeding one year or by fine not exceeding one hundred seventy-five dollars ($175.00) or by both such fine and imprisonment at the discretion of the court'.*
([*]Revised Statute Cumulative Supplement New Jersey 1953-1954 Appendix A, Chapter 9-49 National Defense. 17).
Parts of the Civil Defense Act and Civil Defense and Disaster Control Act have been placed in the University Union and in the University Library. If a more complete statement of the law and penalty is desired it may be found in the stacks of the Library."
Under these circumstances, it is difficult to see how defendants can now claim that they did not have notice of the penalties involved. Their very actions belie any such claim. The ARROW literature they distributed expressly mentioned the penalties involved, and the membership's insistence upon a role of passive resistance is premised upon the existence of some law and concomitant penalty that ought to be resisted.
Turning to the claim that the term "take cover" is unconstitutionally vague, we note that a criminal statute must be sufficiently definite to notify a person who would avoid its *505 penalties, to guide the judge in its application, and to aid those defending one charged with its violation. State v. Monteleone, 36 N.J. 93, 99 (1961). This axiom is particularly relevant where constitutional freedoms are involved. State v. Hudson County News Co., 35 N.J. 284, 295 (1961). However, the requirement of reasonable certainty does not preclude the use of appropriate terms in common usage. State v. Joas, 34 N.J. 179, 186 (1961). In the present case, the term "take cover" not only bears a commonly understood meaning but also was described in the university's notice. A statement issued by ARROW urged those students not attending the open air meeting after the sounding of the sirens "to distribute leaflets if you then go into the `shelter' areas." Any doubts the defendants may have had concerning the meaning of the term "take cover" were surely clarified by the university's civil defense co-ordinators when they instructed defendants to take cover inside a nearby building.
In raising their claim of vagueness, defendants rely heavily upon the unreported case of State v. Faegre, decided June 27, 1961 in Connecticut Superior Court. In Faegre the accused were charged with willful obstruction of civil defense functions during Connecticut's "Operation Alert 1961." The court in Faegre acquitted the defendants because the only notice of the test was a card showing signals and the warning "Take Cover." As the court pointed out:
"There is no definition of what an alert means. There is no definition of what `Take Cover' means. There is nothing contained in Exhibit C, the bulletin, which was sent out to the various directors, commanders and chiefs. There was no particular situation enumerated or spelled out which would indicate exactly what the defense activity would be. Therefore a violation of it would be vague. The administration of it would be vague and the policing and eventual arrest of course would have to depend upon the whim or caprice of the arresting officers."
State v. Faegre is factually inapposite to the present case. Here, the notice issued by the university expressly stated that alert "means attack or natural disaster threatens. You *506 should be ready to obey Civil Defense instructions as issued. You are not required to take cover at this signal." The take cover signal was defined as meaning "immediate danger from attack. You should follow instructions of C.D. Coordinators and take cover in any of the Drew University buildings, and stay put until instructed to leave or the alert signal is blown again. (This signal probably will be blown about 4 P.M.)" As we have already seen, defendants' attention was directed to the appropriate statutes which were made readily available to them. Furthermore, the civil defense co-ordinators correctly interpreted the terms and properly instructed the passively resisting defendants to seek shelter in a nearby building.
Defendants' second challenge to the constitutionality of the statute is that the present requirement of public participation in an air raid drill constitutes an invalid delegation of legislative power. However, defendants offer little factual proof of the alleged "delegation of authority running riot." We have already examined N.J.S.A. App.A:9-45 of the Disaster Control Act which arms the Governor with extensive regulatory powers and traced the interrelationship of this statute, the Governor's proclamation in 1955 and the Director of Civil Defense's bulletin in 1961.
In approaching this claim of invalidity, we note that there is a strong presumption in favor of the constitutionality of a statute. Harvey v. Essex County Bd. of Freeholders, 30 N.J. 381, at p. 388, 153 A.2d 10, at page 14; Gibraltar Factors Corp. v. Slapo, 23 N.J. 459, 463 (1957), affirming 41 N.J. Super. 381, 384 (App. Div. 1956); Sanitary Vendors, Inc. v. Byrne, 72 N.J. Super. 276, 284 (Law Div. 1962). The police power is embodied in the maxim that the welfare of the people is the supreme law. In its essence, the police power is the law of necessity and extends to all great public needs. While emergency does not create this power, it may furnish the occasion for its exercise for the common good. Jamouneau v. Harner, 16 N.J. 500, 514 (1954). Protection of the lives and property of citizens *507 from foreign attack is a primary function of the police power. "Life in a civilized society presupposes security from aggression." Roscoe Pound, "Juristic Theory in the Atomic Age," 9 Rutgers L. Rev. 464, 465 (1954).
Concerning the delegation of legislative powers, our Supreme Court has recently emphasized that there are instances when "the public interest is better served by delegating a large part of detailed lawmaking to the expert administrator, controlled by policies, objects and standards laid down by the legislature, rather than by having all the details spelled out through the traditional legislative process." Boller Beverages, Inc. v. Davis, 38 N.J. 138, 151 (1962). Civil defense procedures must of necessity be flexible to meet the unpredictable acts of aggression. The centralization of power in the Governor  the state commander-in-chief  along with broad discretion concerning regulations, is not an unwarranted delegation in this nuclear age. See James W. Beebe, "Local Government and the H-Bomb," 44 A.B.A. Journal 149 (February 1958); David F. Cavers, "Legal Planning against the Risk of Atomic War," 55 Colum. L. Rev. 127 (February 1955).
Although developments in scientific technology present new problems, the fundamental question of the State's preservation is recurrent. The precursor of this statute was sustained during World War II in the face of an attack that it constituted an unconstitutional delegation of legislative power. The court at that time noted that the State's very existence rested upon the exercise of its police power and that to require the Legislature to "define every detail and prescribe every administrative function" would result in "absurdity." State v. Natelson Brothers, 21 N.J. Misc. 186, 190, 32 A.2d 581 (C.P. 1943). Defendants seek to restrict the applicability of Natelson to a time of war. Such an interpretation ignores not only the basic policy of civil defense but also the concern of the Natelson court with training, protection and preparedness. Ibid. In view of the "cold war," it is realistic to uphold this defensive assertion *508 of the police power in peacetime. Cf. U.S. v. Richman, 190 F. Supp. 889, 892 (D. Conn. 1961).
Although defendants further claim that their freedom of speech has been violated, the record fails to show any such abridgment. The defendants freely circulated their pamphlets and statements before and during the civil defense exercise. They held an open meeting prior to the sounding of the air raid signals. At all times and in all places, defendants freely disseminated their views. In particular, there is not even the slightest suggestion of prior restraint justly found to be noxious in Near v. Minnesota, 283 U.S. 697, 713-715, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).
A possible form of "speech" which might be said to have been abridged is the defendants' right to picket, based on the notion that peaceful picketing is a form of free speech entitled to constitutional protection. Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). However, the Thornhill doctrine has been qualified and limited to such an extent that it is now commonly recognized that picketing may be legislatively regulated as to time, place and purpose. International Brotherhood of Teamsters Union v. Vogt, 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957); Charles O. Gregory, Labor and the Law (2d rev. ed. 1961), pp. 289-329.
Assuming that some form of free speech  such as holding a meeting during the air raid drill  may be said to have been infringed by the imposition of a fine on the defendants for their refusal to take cover during the civil defense exercise, the right of the State to regulate speech under the police power is well established. Adams Newark Theater Co. v. Newark, 22 N.J. 472, 475-6 (1956); State v. Gussman, 34 N.J. Super. 408, 411 (App. Div. 1955). Although beliefs are inviolate, regulation of the exercise of speech is apt when the incidental limitation of personal freedom is justified by the overriding public interest. Thorp v. Bd. of Trustees, 6 N.J. 498, 508-509, vacated as moot 342 U.S. 803, 72 S.Ct. 35, 96 L.Ed. 608 (1951). Where this public interest is the *509 security and survival of the State itself, the regulation granted may have particularly broad latitude ex necessitate. Ibid., at p. 514, 79 A.2d at p. 470. In the present case, the defense of the country and of its citizens is sufficient reason for this regulation.
Defendants' final contention is that the regulation in question violates their religious freedom. As in our preceding discussion of the alleged abridgment of free speech, we must at the outset determine whether the record actually demonstrates any limitation on religion. Although the statements distributed by defendants mention "Christian concern" and the "leadings of conscience," the principal motivation clearly was not religious. Despite reference to the Rev. Martin Luther King, Jr., and Mahatma Gandhi, the several ARROW statements presented political, philosophical or practical views, rather than religious beliefs. For example, the four major reasons for opposition to civil defense in ARROW's Statement of Intention and Purpose are: (1) "the functional futility of civil defense," (2) the creation of "an atmosphere of fear and hatred," (3) civil defense's integral part in the strategy of military action, and (4) civil defense's promotion of "public apathy towards disarmament negotiations."
Even if defendants may possibly be said to have been expressing valid religious sentiment in their demonstration  and we do not so find  it is axiomatic that, while the right of religious belief is absolute, the exercise of practices corollary to that belief may be subjected to reasonable regulation by the police power and must be considered in the light of the general public welfare. Cantwell v. Connecticut, 310 U.S. 296, 303-304, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Reynolds v. United States, 98 U.S. 145, 166-167, 25 L.Ed. 244 (1878). As Judge Learned Hand commented in Otten v. Baltimore & O.R. Co., 205 F.2d 58, 61 (2 Cir. 1953):
"We must accommodate our idiosyncrasies, religious as well as secular, to the compromises necessary in communal life; and we can hope for no reward for the sacrifices this may require beyond our satisfaction from within, or our expectations of a better world."
*510 A review of New Jersey cases demonstrates that our courts have upheld the enforcement of such "compromises" in numerous instances. School children have been compulsorily vaccinated over the protests of parents or guardians. Board of Education of Mountain Lakes v. Maas, 56 N.J. Super. 245, 267-269 (App. Div. 1959), affirmed 31 N.J. 537 (1960); Sadlock v. Bd. of Education of Carlstadt, 137 N.J.L. 85, 91 (Sup. Ct. 1948). A blood transfusion has been ordered for a baby upon its birth, contrary to the wishes of its parents. Hoener v. Bertinato, 67 N.J. Super. 517, 522-523 (Juv. & Dom. Rel. Ct. 1961). Religious activities have been limited by uniformly applied zoning ordinances. Allendale Congregation of Jehovah's Witnesses v. Grosman, 30 N.J. 273, 277-281 (1959); Sexton v. Bates, 17 N.J. Super. 246, 256-259 (Law. Div. 1951), affirmed 21 N.J. Super. 329 (App. Div. 1952). A convict's attendance at religious services has been restricted by prison discipline. McBride v. McCorkle, 44 N.J. Super. 468, 478-479 (App. Div. 1957).
The constitutional guaranty of religious freedom is not a guaranty of immunity for violation of the law. Consequently, a corporation doing religious work has been required to comply with the Fair Labor Standards Act. Mitchell v. Pilgrim Holiness Church Corp., 210 F.2d 879 (7 Cir.), cert. denied 347 U.S. 1013, 74 S.Ct. 867, 98 L.Ed. 1136 (1954). Employees forced to join a union shop have not been allowed to find respite from membership on the grounds of freedom of religion. Wicks v. Southern Pacific Co., 231 F.2d 130 (9 Cir.), cert. denied 351 U.S. 946, 76 S.Ct. 845, 100 L.Ed. 1471 (1956). In Holdridge v. United States, 282 F.2d 302, 311 (8 Cir. 1960), three defendants were prosecuted for violating a statute prohibiting their re-entry upon a military reservation. Defendants argued that they felt compelled by their religious beliefs to bring their thought of immorality of war, particularly nuclear war, to the attention of military authorities. The court, in sustaining the convictions, quoted from Baxley v. United States, 134 F.2d 937, 938 (4 Cir. 1943):
*511 "Even clearer is it that one is criminally responsible who does an act which is prohibited by a valid criminal statute, though the one who does this act may do it under a deep and sincere religious belief that the doing of the act was not only his right but also his duty."
Defendants analogize their position to that of the conscientious objectors to military service. Such an analogy, however, only strengthens the case against them. The exemption from "combat training and service in the armed forces of the United States" is granted by statute to one "who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Religious training and belief in this connection means an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, and philosophical views or a merely personal moral code." 50 U.S.C.A. Appendix, § 456(j). See 2 Emerson and Haber, Political and Civil Rights in the United States (2d ed. 1958), pp. 1192-4.
Defendants base their claim of abridged religious freedom in large measure on the authority of West Virginia Bd. of Education v. Barnett, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), which held that school children could not be compelled to salute the national flag while reciting the pledge of allegiance. In particular, defendants quote from Justice Jackson:
"The freedom asserted by these appellees does not bring them into collision with rights asserted by any other individual. It is such conflicts which most frequently require intervention of the State to determine where the rights of one end and those of another begin." Ibid., at p. 630, 63 S.Ct., at p. 1181.
Here, the facts are far different from those presented in Barnett. A civil defense drill is much more than an enforced ritual. It is potentially a matter of life and death. As we have already pointed out, the basis of the State's police power is the protection of its citizens. This protection must be granted irrespective of the fact that certain individuals may *512 not wish to be saved or protected. Just as the State may require persons to be vaccinated or to be quarantined, so may it, as here, take steps to reduce the exposure of the citizens to the dangers of a possible war, including atomic bomb radiation.
In the only recorded case dealing with prosecutions arising from the refusal to take cover during a civil defense exercise, the New York Court of Appeals, in affirming the convictions below, specifically rejected the argument that the defendants had been "coerced into war preparation against religious scruples. This was merely training in how to take shelter in the event of an air raid, in the nature of a lifeboat drill at sea or a fire drill in a school." People v. Peck, 7 N.Y.2d 76, 80, 195 N.Y.S.2d 637 (Ct. App. 1959), affirming per curiam People v. Parilli, 1 Misc.2d 201, 499, 147 N.Y.S.2d 618 (Magis. Ct. 1955), appeal dismissed and cert. denied 364 U.S. 662, 81 S.Ct. 389, 5 L.Ed.2d 372 (1961).
The judgment entered in the County Court is affirmed.